United States Court of Appeals,

Eleventh Circuit.

No. 94-8735.

David Loomus CARGILL, Petitioner-Appellant,

v.

Tony TURPIN, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.

Aug. 21, 1997.

Appeal from the United States District Court for the Middle District of Georgia. (No. 4:91-CV-12-COL), J. Robert Elliott, Judge.

Before HATCHETT, Chief Judge, DUBINA, Circuit Judge, and KRAVITCH, Senior Circuit Judge.

HATCHETT, Chief Judge:

The appellant, David Cargill, a Georgia state prisoner convicted of two counts of murder and two counts of armed robbery, appeals the denial of his habeas corpus petition challenging his convictions and death sentences. We affirm.

## I. FACTS[1]

On the evening of Tuesday, January 22, l985, police discovered the dead bodies of Cheryl Williams and her husband, Danny, on the floor of the Premium Oil Service Station on River Road

---

[1]We base our statement of facts on the findings of the Georgia Supreme Court in *Cargill v. State,* 255 Ga. 616, 340 S.E.2d 891 (1986). "State court findings of historical fact are subject to a presumption of correctness to the extent stated by 28 U.S.C. § 2254." Williams v. Turpin, 87 F.3d 1204, 1209 (11th Cir.1996). Cargill does not challenge the Georgia Supreme Court's findings of fact, and they do not "otherwise appear" to fall under any of the circumstances enumerated in section 2254(d)(1)-(8). Accordingly, these findings are "presumed to be correct." 28 U.S.C. § 2254(d) (1994).

We note that the appellee has not asserted that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") codified at chapter 154 of Title 28, 28 U.S.C. §§ 2261-66, apply to this case. *See* 28 U.S.C.A. § 2261(a)-(c) (West Supp.1997). Moreover, the AEDPA's relevant amendments to chapter 153 of Title 28 do not apply here. *See* Lindh v. Murphy, --- U.S. ----, ----, 117 S.Ct. 2059, 2066-68, --- L.Ed.2d ----, ---- (1997) ("We hold that the negative implication of § 107(c) [of the AEDPA] is that the new provisions of chapter 153 generally apply only to cases filed after the [AEDPA] became effective.").

in Bibb City, Georgia.[2]  The Williamses had each sustained two gunshots to the head while lying on the floor;  Cheryl Williams was shot from a distance of less than two feet.  The assailants stole approximately $480 from the service station and a knife from Danny Williams.[3]

During the previous week, on Wednesday, January 16, 1985, John McCollum's pickup truck, a green, 1969 model with a gray right-front fender and a dog box in the bed, was stolen in Opelika, Alabama.  On the night of January 22, witnesses saw the truck near the Premium Oil Service Station.  On the weekend prior to the murders, Katherine Brown saw Cargill and his brother, Thomas Cargill (commonly known and hereinafter referred to as "Tommy"), in possession of the truck.  Cargill's then-wife, Brenda Mathis, identified McCollum's truck in a photograph as the one that Cargill possessed at the time of the murders.[4]  Mathis also testified that Cargill had given her some items which, it turns out, belonged to McCollum and were in his truck at the time it was stolen.[5]  Another witness, Hoyt Ledford, saw Cargill and Tommy on the day of the crimes in possession of a truck fitting the description of McCollum's vehicle.[6]

On several occasions prior to the murders, Mathis heard her husband talk about the "big crime" or "the big one," and state that he "wouldn't leave any witnesses" because "[d]ead people don't talk."  Travis Allred, who had been Cargill's next-door neighbor, testified that Cargill once asked him whether he wanted to earn some extra money.  According to Allred, Cargill related, " "Well, I've been scoping out this place on River Road and I want to rob it and I know where the safe

---

[2]Cheryl Williams worked part-time at the service station, and her husband was assisting her that evening.  The Williamses had four boys under ten years of age.

[3]The cash served as the basis for one of the armed robbery counts and the knife for the other.

[4]Cargill and Mathis divorced shortly after his arrest in this case.  At the time of the crimes, they lived together in an apartment with Mathis's son from a prior marriage.

[5]Additionally, Mathis discovered McCollum's hunting vest, which was also in his truck at the time it was taken, in her and Cargill's apartment.

[6]Ledford is the stepfather of Tommy's wife, and Tommy lived in his house in Phenix City, Alabama, at the time of the crimes.

2

is and everything, but if the people there, you know, identify me that they would'—that he would have to kill the people."

According to Mathis, on the morning of January 22, Tommy arrived at her and Cargill's apartment, and Cargill told him to return after dark. Tommy left in McCollum's truck. In the evening, Tommy returned, telling Cargill that "[t]he girl" or "the girls" "are there alone," and that he "had just went by there." Cargill then placed his handgun (which he had previously given to Mathis for safekeeping) in his pocket and told Tommy, "Good. Let's go."

According to Mathis, Cargill returned to their apartment between approximately 9:00 and 10:00 p.m. that evening. Although he did not have any money when he left, he returned with a large box of fried chicken and other food.[7] While Mathis, Cargill and her son ate, she noticed blood on Cargill's shirt sleeve. After looking to see if anyone was watching him, Cargill rubbed some chocolate pudding into the blood stain. During dinner, a report about the armed robbery appeared on television. According to Mathis, "David said, he laughed—well, not laughed but "Aha, they must not have got anything.'" After dinner, Cargill went to take a bath, telling Mathis "not to mess with" his clothes. Mathis, however, gave Cargill the shirt into which he had rubbed the pudding, telling him to wash it out. Cargill washed out the shirt while in the bathtub. Later that evening, Cargill gave Mathis between $150 and $175 and told her that if anyone asked about the money, she should state that she received it from her former husband for child support. Later in the week, Mathis and Cargill watched another television news report concerning the crimes. After the report stated that there were witnesses to the murders, Cargill laughed and said, "No, there wasn't any witnesses."

On the Saturday night after the crimes, January 26, Cargill, Mathis and Richard Whitley went to a nightclub. While there, Walter Holler approached Cargill, propped his arm on Cargill's shoulder and said, "How about it, David?" According to Holler, Cargill responded, "Get out of my face. I

_____

[7]Patrick Tidwell testified that he encountered Cargill at a bar around 10:30 p.m. on the evening of January 22. Tidwell gave Cargill a ride home, stopping en route at a Kentucky Fried Chicken restaurant where Cargill purchased food. According to Tidwell, Cargill had "a lot of money"—"a pretty good stack." Mathis testified that around this time she and Cargill were in a difficult financial situation and neither of them had much money.

3

killed two. One more wouldn't matter." Cargill, Mathis and Whitley stayed at the club until it closed at 2:00 a.m. Sunday morning. While returning home, Cargill complained about Clinton Layfield "running his mouth" about Cargill purchasing a gun from him. The group drove to Layfield's apartment, and Cargill set the residence on fire. The next day, January 28, a television news program reported a possible connection between the fire and the murders; Mathis communicated this information to Cargill. In response, Cargill informed Mathis that he was going out to get some coffee. When Cargill did not return, Mathis went to Tommy's residence to find Cargill or discover his whereabouts. Tommy, however, would not tell Mathis where Cargill was; eventually Mathis threatened to go to the police. According to Mathis, Tommy said, "I know where David is. He's fine. Don't go to the police. It will just make things worse for us. We've got enough on us." Mathis did not see Cargill again until after his arrest.

Police recovered McCollum's truck, abandoned and with its interior burned, on January 24. On February 10, police found a pistol later identified as the murder weapon hidden under a doghouse in the backyard of Ledford's residence. The pistol was in a plastic bag and had no fingerprints. Layfield testified that he had sold the pistol to Cargill. During the transaction, Cargill told Layfield not to mention the pistol to anyone and indicated that he intended to shoot someone with it.

Police arrested Cargill on February 13, 1985, at a motel in Columbus, Georgia, and twice informed him of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). About forty-five minutes after the arrest, Columbus Police Department Detectives Rudolph Lovell and Eugene Allmond commenced an interrogation of Cargill at police headquarters. Before doing so, however, Allmond again read Cargill his *Miranda* rights. Lovell showed Cargill photographs of the Williamses both before and after they were murdered. Allmond discussed McCollum's stolen truck, the murder weapon and items of clothing the police believed Cargill wore on the night of the murders. Lovell then recounted Mathis's version of events to Cargill. After bringing Mathis into the interrogation room, Lovell asked her if the information he had just recited was true and whether she would testify to it in court. Mathis answered in the affirmative.

4

After Mathis left the room, Allmond told Cargill that his brother Tommy had implicated him as the murderer of the Williamses. According to Allmond, Cargill responded, "All of you sons-of-a-bitches are alike. The only time [he] would've said anything to you is if you beat hell out of him. I don't care what you say, I don't know what you're talking about and I'll ... deny it to my dying day. Fuck you." At this point, Allmond left the room, and Lovell took over the interrogation. Lovell played for Cargill a tape-recorded message from Tommy, which related the following:

> Uh, David, this is Tommy. I wanted you to know I didn't want to tell them all this stuff, but I got to thinking about all of it and I've done some serious thinking. Right now, buddy, you're the only hope I got. They've got me charged with it. The only way they can clear me with it is for you to tell them that you done it. I don't know if you'll do that or not, but I'd appreciate it if you would. It's hard for me to ask you to do something like this after I done went and told on you and all, but right now you're the only hope I've got, buddy.

> David, I want you to think about something. I know you don't have a family and all, but I've got a little girl and one day I want to get out and see her; but as it stands, unless you tell them, there ain't no way I'll ever be able to do that, buddy. I don't know if you love your old lady and that little boy or not, but I wouldn't take nothing in the world for mine.

After playing the message, detectives brought Tommy into the interrogation room. According to Lovell, Cargill asked his brother whether the police had hurt him. Tommy replied, "No, they haven't laid a hand on me." Cargill then asked Tommy whether the police had informed him about Whitley's suicide.[8] Tommy said that they had. Tommy then told his brother, "I've got a little girl" and "I'd like for you to tell them how this really happened. If you don't tell them you're the one that shot them, I'm—I feel like I'm going to the electric chair." Thereafter, Tommy was escorted from the interrogation room.

According to Lovell, Cargill sat in silence for about ten seconds. Cargill then stated, "Tommy didn't know what was going to happen at that station." Lovell responded, "You mean Tommy knew there'd be an armed robbery but didn't know people would get killed?" Cargill answered, "Yes, sir." Lovell then stated, "Come on, David, I need to hear it from your mouth." According to Lovell, Cargill "took a deep breath, looked up at the ceiling, and ... said, "Tommy

---

[8]Law enforcement officials apprehended Whitley for an apparently unrelated criminal offense, and he committed suicide while in jail.

5

didn't shoot those people, I did.'" Lovell asked Cargill to elaborate, but Cargill stated that he wanted to speak to a lawyer. Cargill's confession was not recorded or transcribed, and he denies making it.

## II. PROCEDURAL HISTORY

After a three-day trial, on July 20, 1985, a jury of the Superior Court of Muscogee County concluded approximately three and one-half hours of deliberations and convicted Cargill of two counts of malice murder and two counts of armed robbery.[9] On the same date, after the conclusion of the sentencing proceeding, the jury deliberated for about two and one-half hours before imposing a sentence of death for each of the murders.[10] Cargill appealed, and the Georgia Supreme Court affirmed his convictions and sentences. *Cargill v. State*, 255 Ga. 616, 340 S.E.2d 891 (1986), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 180, *reh'g denied,* 481 U.S. 1024, 107 S.Ct. 1914, 95 L.Ed.2d 519 (1987).

In May 1987, Cargill filed a state habeas corpus petition in the Superior Court of Butts County, Georgia. After conducting an evidentiary hearing, the state habeas corpus court denied relief in August 1989 in an unpublished order. Thereafter, the Georgia Supreme Court denied Cargill's application for a certificate of probable cause, and the United States Supreme Court denied *certiorari. Cargill v. Zant,* 495 U.S. 963, 110 S.Ct. 2576, 109 L.Ed.2d 758, *reh'g denied,* 497 U.S. 1046, 111 S.Ct. 7, 111 L.Ed.2d 823 (1990).

On January 31, 1991, Cargill filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Middle District of Georgia, asserting thirty-eight claims for relief. In an order issued on April 13, 1994, the district court denied the writ, finding that Cargill "ha[d] not established a need for a federal evidentiary hearing." The court did not "deem it necessary to discuss each of the numerous claims made by the Petitioner." Cargill

---

[9]Cargill testified at his trial, serving as the lone witness on his behalf. The state tried Tommy separately, after his brother, and in October 1985 a jury found him guilty of two counts of malice murder and two counts of armed robbery. Tommy received four consecutive life terms of imprisonment. *See* Cargill v. State, 256 Ga. 252, 347 S.E.2d 559 (1986) (affirming convictions and sentences).

[10]The jury found two aggravating circumstances under O.C.G.A. § 17-10-30(b)(2).

6

subsequently moved to alter or amend the judgment, and on June 2, 1994, the district court denied that motion. On June 29, l994, the district court granted Cargill a certificate of probable cause to appeal. Cargill now raises six claims of error, five of which merit discussion.[11]

## III. DISCUSSION

### A. Confrontation Clause Claim

Cargill argues that the state trial court violated his rights under the Confrontation Clause of the Sixth Amendment in allowing witnesses to testify to several of Tommy's out-of-court statements.[12] More specifically, Cargill asserts that "through the testimony of certain police officers, the prosecutor improperly elicited ... inculpatory statements Tommy Cargill allegedly made while he was in police custody." Cargill identifies as the "[m]ost devastating[ ]" of these statements Lovell's testimony that Tommy told Cargill, "I'd like for you to tell them how this really happened. If you don't tell them you're the one that shot them, I'm—I feel like I'm going to the electric chair."[13] Cargill also objects on Confrontation Clause grounds to the court's introduction into evidence of Tommy's tape-recorded statement. Cargill contends that all of the statements "constitute hearsay, because they are out-of-court assertions admitted for the truth of the matter asserted, i.e., that David

[11]Cargill contends preliminarily that the denial of his habeas corpus petition "cannot be affirmed" given the district court's failure to render findings of fact and conclusions of law. The record on appeal affords us a complete understanding of the issues, and therefore, although we in no way approve of the district court's performance, we proceed to the merits of Cargill's claims. *See* Tejada v. Dugger, 941 F.2d 1551, 1555 (11th Cir.1991), *cert. denied,* 502 U.S. 1105, 112 S.Ct. 1199, 117 L.Ed.2d 439 (1992).

[12]The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. The Fourteenth Amendment makes this fundamental right obligatory on the states. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067-68, 13 L.Ed.2d 923 (1965).

[13]Cargill also cites the following as instances of the abridgement of his constitutional right to confrontation: (1) Allmond's testimony that Tommy "had told us what had happened during this situation [*i.e.,* the perpetration of the crimes]"; (2) Lovell's testimony that McCollum's truck "was located and stolen just like Tommy Cargill had told us it had been"; and (3) Lovell's testimony concerning the murder weapon—"Tommy Cargill had told us where we could find it." Cargill also objects to the prosecutor's references to these statements in his opening statement and during cross-examination. We reject as meritless the appellee's contention that Cargill failed to raise these claims in his state and federal habeas corpus petitions.

7

Cargill perpetrated these crimes." Cargill argues that because these statements do not fall under a firmly rooted hearsay exception and do not bear sufficient indicia of reliability, their introduction into evidence violated his Confrontation Clause rights, "thereby prejudicing him at both the guilt/innocence and sentencing phases" of his trial.[14]

We disagree with Cargill's characterization of these statements as hearsay. Simply put, this evidence was never offered or admitted for its truth.[15] On July 2, 1985, Cargill's counsel filed a motion *in limine,* "respectfully mov[ing] the Court to prohibit the introduction into evidence by the State of alleged Co-Defendant Tommy Cargill's confession as well as the fruits of said confession." At the July 8 hearing on the motion, Cargill's counsel clarified that "[w]hat we have asked for ... is that ... any statements of alleged co-defendant, Tommy Cargill, not be introduced." In response, the

---

[14]The constitutional right to confrontation does not, of course, bar all hearsay evidence. Bourjaily v. United States, 483 U.S. 171, 182, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144 (1987); Dutton v. Evans, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970) (plurality opinion). Where the hearsay statements at issue are the out-of-court declarations of a co-conspirator, those statements are deemed trustworthy for Confrontation Clause purposes if the government shows they bear sufficient "indicia of reliability." *Bourjaily,* 483 U.S. at 182, 107 S.Ct. at 2782; Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). The Supreme Court has held that "no independent inquiry into reliability is required when the evidence "falls within a firmly rooted hearsay exception.' " *Bourjaily,* 483 U.S. at 183, 107 S.Ct. at 2782 (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). However, "[u]nder Georgia law, a statement by a co-conspirator is admissible as long as the co-conspirator's statement was made while "[t]he culprits [are] still concealing their identity.' " Horton v. Zant, 941 F.2d 1449, 1464 (11th Cir.1991) (first alteration added) (quoting Chatterton v. State, 221 Ga. 424, 144 S.E.2d 726, 732 (1965)), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); *see also* O.C.G.A. § 24-3-5 (1995). Georgia's rule is thus broader than its federal counterpart. *See* Fed.R.Evid. 801(d)(2)(E) ("a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" does not constitute hearsay). In *Bourjaily,* the Supreme Court "noted, in dicta, that the formulation used in Georgia ... is sufficiently different to mandate a case by case evaluation of the hearsay for indicia of reliability." *Horton,* 941 F.2d at 1464.

[15]Hearsay is "an out-of-court statement offered to prove the truth of the matter asserted." Dover v. State, 250 Ga. 209, 296 S.E.2d 710, 713 (1982), *cert. denied,* 459 U.S. 1221, 103 S.Ct. 1228, 75 L.Ed.2d 462 (1983); *see also* Lee v. Illinois, 476 U.S. 530, 543 n. 4, 106 S.Ct. 2056, 2064 n. 4, 90 L.Ed.2d 514 (1986) (defining hearsay as " "testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter' ") (quoting Edward W. Cleary, *McCormick on Evidence* § 246, at 584 (2d ed.1972)); Padgett v. State, 251 Ga. 503, 307 S.E.2d 480, 481 (1983) (quoting McCormick definition with approval).

8

prosecution made clear that it would not be proffering this evidence for its truth, but rather to demonstrate the circumstances surrounding and voluntariness of Cargill's confession:

> There are some occasions, in fact, I think the Court will recall from the *Jackson [v.] Denno* hearing, that part of the interrogation of this defendant involved making him aware of portions of the brother's statement while he was being interrogated. Those certainly would be admissible, Your Honor, insofar as the voluntariness of the statement, and the circumstances surrounding the statement, not for the truth that they're contained in—that's contained therein—but because the co-defendant had made such a statement, and it was part and parcel of the circumstances surrounding the confession that this defendant gave.
>
> ....
>
> ... [T]here is no way that the statement that this defendant gave would make any sense whatsoever unless it is taken in conjunction with the interrogation where the officers informed this defendant of the evidence that the co-defendant had given. And there was also that tape played, and then there was a confrontation, face-to-face, between this defendant and his brother. And following that the statement was given.
>
> ....
>
> It is part and parcel of the voluntariness. We are required not only to satisfy this Court of the voluntariness of that statement, but we also have to satisfy the jury as to that. And I don't feel that we can do it in any reasonable fashion unless and until we're allowed to go into the entire circumstances of that statement.

At a hearing on July 12, the trial court denied Cargill's motion, adopting the reasoning of the prosecution:

> I want to say the Court will not let the alleged statements of the defendant's brother in for the truth of those statements; however, in reading the *Jackson [v.] Denno* hearing in this case, the Court sees that they are relevant to show voluntariness of the defendant's alleged statements and for that limited purpose I will deny the motion in limine. I will instruct the jury that certain statements were allegedly made by the brother of the defendant; that I am not allowing the state to refer to them for the truth of the brother's statement.

Thus, on its face, the court's ruling applied to all of Tommy's statements—"the Court will not let the alleged statements of the defendant's brother in for the truth of those statements."

At trial, Cargill's counsel objected to the playing of Tommy's tape-recorded statement. The court, adhering to its prior ruling, gave the following cautionary instruction:

> Before you play that, let me just state that I am admitting this not for the truth for [sic] the statement but what the witness played to the defendant, David Cargill, that his brother, Tommy Cargill, said on the tape; and I'll ask the jury to consider this statement only to show what the police played to the defendant, David Cargill, not for the truth of the statement.

9

We presume, of course, that the jury followed this instruction. *See United States v. Chandler,* 996 F.2d 1073, 1088 (11th Cir.1993) ("The jury is presumed to follow the instructions they are given."), *cert. denied,* 512 U.S. 1227, 114 S.Ct. 2724, 129 L.Ed.2d 848 (1994); *United States v. Brown,* 983 F.2d 201, 202 (11th Cir.1993) (applying "the well-recognized presumption that a jury follows its instructions").[16] The trial court did not, however, give a cautionary instruction concerning Lovell's testimony that Tommy prodded Cargill to admit that he was the "one that shot them," or to any of the other purportedly violative occurrences outlined above at footnote thirteen. This is not surprising, though, because Cargill's lawyers failed to lodge objections to any of these instances.

In short, the trial court ruled on July 12 that it would not admit any of Tommy's statements for their truth, but rather for the "limited purpose" of showing context and voluntariness. When Cargill objected to one of Tommy's statements, *i.e.,* the taperecorded message, the court admitted that statement for a limited purpose—not for its truth—and gave the jury an instruction to that effect.[17] When Cargill's lawyers failed to make objections to the admission of other statements, the

---

[16]As stated in *Richardson v. Marsh,* 481 U.S. 200, 207, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987), the Supreme Court recognized "a narrow exception to this principle" in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), holding "that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a non-testifying codefendant is introduced at their *joint* trial, even if the jury is instructed to consider the confession only against the codefendant." (Emphasis added.) "*Bruton,* however, is distinguishable from the situation here. [Cargill's] trial was not a joint trial. Two defendants were not being tried side by side as they were in *Bruton.*" Hoover v. Beto, 467 F.2d 516, 530 (5th Cir.) (*en banc* ), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed.2d 673 (1972).

[17]On direct appeal the Georgia Supreme Court found that "[t]he trial court admitted th[e] taped statement of Tommy Cargill for the limited purpose of showing part of the totality of the circumstances under which [Cargill's] confession was made." *Cargill,* 340 S.E.2d at 908. We accord the presumption of correctness to this finding of historical fact. *See* 28 U.S.C. § 2254(d) (1994).

> We also note that at the sentencing phase of Cargill's trial the court instructed the jury as follows:
>
> > [Y]ou are authorized to consider all the evidence received here in court in both stages of the proceedings presented by the state and the defendant throughout the trial before you *unless the Court has instructed you to consider certain evidence introduced by the state for a limited purpose, in which event such evidence shall not be considered by you in determining punishment.*

10

court, not surprisingly, did not direct that the evidence was admitted for a limited purpose or administer a cautionary instruction. This does not mean, however, that the court had somehow retreated from its July 12 ruling. Cargill's lawyers bore the responsibility of giving that ruling effect.

Consequently, Cargill has not persuaded us that any of the now contested statements were offered or admitted for their truth. Stripped of this, Cargill's contentions fail, as the trial court's admission of the evidence carried no constitutional implications. As the Supreme Court stated in *Dutton v. Evans:*

> Evans was not deprived of any right of confrontation on the issue of whether [co-conspirator] Williams actually made the statement related by [witness] Shaw. Neither a hearsay nor a confrontation question would arise had Shaw's testimony been used to prove merely that the statement had been made. The hearsay rule does not prevent a witness from testifying as to what he has heard; it is rather a restriction on the proof of fact through extrajudicial statements. From the viewpoint of the Confrontation Clause, a witness under oath, subject to cross-examination, and whose demeanor can be observed by the trier of fact, is a reliable informant not only as to what he has seen but also as to what he has heard.

400 U.S. at 88, 91 S.Ct. at 219; *see also United States v. Inadi,* 475 U.S. 387, 398 n. 11, 106 S.Ct. 1121, 1128 n. 11, 89 L.Ed.2d 390 (1986) ("[M]any co-conspirator statements are not introduced to prove the truth of the matter asserted, and thus do not come within the traditional definition of hearsay...."); *Tennessee v. Street,* 471 U.S. 409, 414, 105 S.Ct. 2078, 2081-82, 85 L.Ed.2d 425 (1985) (nonhearsay "raises no Confrontation Clause concerns"). Where a claim of constitutional magnitude is lacking, we will not, in the habeas corpus context, review a trial court's actions concerning the admissibility of evidence. *Alderman v. Zant,* 22 F.3d 1541, 1555 (11th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994); *Osborne v. Wainwright,* 720 F.2d 1237, 1238 (11th Cir.1983).

Nonetheless, we note that had Cargill's Sixth Amendment theory prevailed, we would have found the errors harmless under the standard articulated in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). *See United States v. Cross,* 928 F.2d 1030, 1052 (11th Cir.) ("It is well-established that the improper admission of co-conspirator hearsay, like other Confrontation Clause errors, is subject to the harmless error rule ...."), *cert. denied,* 502 U.S. 985, 112 S.Ct. 594, 116 L.Ed.2d 618 (1991) *and* 502 U.S. 1060, 112 S.Ct. 941, 117 L.Ed.2d 112 (1992);

11

*Cumbie v. Singletary,* 991 F.2d 715, 724-25 (11th Cir.) (applying *Brecht* standard for harmless error after finding Confrontation Clause violation based on *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988)), *cert. denied,* 510 U.S. 1031 (1993). After considering their centrality and frequency, as well as the strength of the prosecution's case, we would not conclude that the errors " "had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht*, 507 U.S. at 637-38, 113 S.Ct. at 1722-24, 123 L.Ed.2d at 373 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

B. Prosecutorial Misconduct Claim

Cargill next argues that improper prosecutorial comments during the guilt and penalty phases of his trial probably "changed the jury's exercise of its discretion in choosing between life imprisonment and death." Cargill first asserts that the prosecutor made three improper comments during the opening statement of the guilt phase that emphasized his dangerousness and thus contributed to the jury's propensity to sentence him to death. He also contends that the prosecutor made several improper comments during closing argument in the sentencing proceeding, with the most egregious constituting an impermissible comment on his potential for parole.[18] Before analyzing Cargill's claim, we provide the relevant factual background and outline the applicable standard of review.

1. Factual Background

a. Opening Statement at the Guilt Phase

As mentioned, Cargill contends that the prosecutor made three improper remarks during his opening statement of the trial. The first is as follows:

> The evidence will show, while we're talking about Richard Whitley, and why he's with these folks [Cargill, among others], I don't know, but that Whitley was a successful contractor, businessman, relatively wealthy, but that he got involved with these folks according to the

---

[18]The appellee correctly asserts that Cargill did not raise in his habeas corpus petition all of the allegedly improper remarks on which he now relies. Any of the comments that Cargill cites in his brief to this court that are not hereinafter discussed were found to be either (1) asserted for the first time on appeal, and thus not cognizable, or (2) innocuous.

best information that we have on discussing some problems that he had with a former wife and that he wanted this former wife killed.

In addition, after stating that witness Holler did not "come forward" (*i.e.,* contact law enforcement authorities) until after Cargill's arrest, the prosecutor explained that "[a] number of these people [*i.e.,* witnesses] did not [come forward] because they were afraid of the defendant in this case." Third, the prosecutor stated that the police "told the defendant that Tommy had told them ... that the defendant had shot the folks without any reaction for a long period of time."

b. Evidence and Closing Argument at the Sentencing Phase

At the sentencing proceeding, the prosecution called only one witness, John Adams, the Sheriff of Harris County, Georgia. Adams testified that Cargill had a total disrespect for law and order and had a bad reputation in the community for "turbulence and violence," "cutting people" and stealing and receiving stolen property. Cargill called five witnesses: his mother, his sister, two former neighbors and a minister. Cargill's mother, Marthareen Cargill, testified on direct examination that as a youth Cargill was a "fine boy"—obedient, quiet, helpful and diligent. She described her adult son as hard-working and generous. In concluding her testimony, she asked the jury to "[p]lease have mercy on my son." During his cross-examination of Ms. Cargill, the prosecutor elicited that Cargill liked to fight dogs and had once "cut" his brother Larry with a knife. Cargill's sister, Marsha Cannon, testified that as a boy her brother was loving, considerate and never any trouble. Cannon described her brother in his adult years as a supportive sibling and son, one who lent assistance—financial and otherwise—to family members. She told the jury, "Please don't take his life; let him live." On cross-examination, Cannon acknowledged that her brother had received a "substantial fine" in January 1985 from Harris County authorities for "throwing a beer bottle at the state patrol," and had used drugs. One of the former neighbors, who had known Cargill for about twenty years, described him as a "pretty good boy" and non-violent—a "quiet type" who "minded his mother and father pretty good." The other ex-neighbor testified that Cargill was a pleasant, quiet child; that he had never seen Cargill in any kind of fight; that Cargill was hard-working and obeyed his parents; and that Cargill had lent him money several times. Cargill's

13

final witness, a local minister, testified about the relationship he had developed with Cargill subsequent to Cargill's arrest in this case. The minister testified that Cargill was kind, cordial and thoughtful during their visits, and had written some "very nice" correspondence. On cross-examination, the minister stated that although the Cargill family belonged to his church, he had never met Cargill until after Cargill's arrest—when the appellant requested to meet with him.

Near the outset of his closing argument, the prosecutor told the jury:

> You will have to elect or select between the death penalty and the life sentence. We are obviously encouraging the death penalty. That is no revelation. We are going to make some remarks to you and show you, based on experience, based on the circumstances of this crime, based on the circumstances of this defendant why we feel this to be the appropriate punishment.

Later, after describing some of the purposes behind punishment, the prosecutor addressed the notion of deterrence:

> If you punish one child, another child sees by that example. He doesn't put his hand in the cookie jar, walk in the flowerbed, or any one of a thousand and a million trespasses that kids can get into. We have to consider that in this court with deterrents. On one level it sounds a bit ridiculous to say, if we punish this man and punish him appropriately that it might stop somebody else from doing this. But it makes sense. I don't know. There have been studies done. Some folks say that the death penalty's a deterrent; some say that it's not. I don't know. I'll tell you as this defendant's concerned, number one, it will certainly deter this defendant from ever doing what he did again. Number two, history tells us, and while I am not an old man, I can remember when times were a lot simpler when we did not have things like this to contend with and when a death penalty being given was not a headline type thing. And I'm not saying there was no crime, but the papers weren't full of it day after day after day after day of heinous crimes. I submit to you that criminals who go out and do these acts, number one, feel like that they are so smart they'll never get caught; and, number two, they'll be punished in a very modest fashion. It will be an inconvenience, just like the overhead for a business, paying the electric bill, and he will try it over and over again. Deterrent? I don't know, but I will tell you this and I sincerely believe it. If by your punishing this defendant appropriately for these two murders and these two armed robberies deters even one individual from doing a similar crime, then by the grace of God it has served its purpose. For this defendant for the acts that he has done has forfeited his right to be among us. He has forfeited his right to live. So seldom do we see crimes so cold-blooded and not one but two bullets fired into the heads.

After, among other things, discussing the circumstances of the crime, denigrating the relevance of rehabilitation in this case and justifying his "emotionalism," the prosecutor discussed the testimony at the sentencing proceeding:

> We brought on Sheriff John Adams who told you about the defendant's reputation, and that reputation was bad, for turbul[e]nce and violence. That's what we have to call fighting and

14

stabbing and cutting and that kind of thing. It's a bad reputation. We—he also testified as to the defendant's reputation on things like larceny and so forth. We did get the one sister to come out and say finally, tell you about his drug abuse. Now, that's what you're passing on. This is the good old boy that you're going to be passing on. His mother loves him. That is not evidence. She begged for him. If you wanted begging, we could've given you some begging; but that's not the way it ought to be done.

... The defendant's sister said she knew of that fine he was to pay in January in Harris County. His mother testified. She told us he was a good little boy. She didn't tell us anything about once he grew up. But we had emphasized some things that we already knew, that he was a dog-fighter, a compassionate sport.... And she further testified that he only cut his brother one time. That's because he was coming at him with a tire tool, just one time.

He had his sister up there. He helped her move out. He gave her money. Look, this is blood. And there's not a crime in this world that blood is going to overlook, is not going to mitigate, is not going to say does not deserve some special treatment, no matter what anybody does. So the mere fact that that happens proves nothing.

After briefly mentioning the appearances of Cargill's two former neighbors, the prosecutor continued:

[A]nd then we came to the preacher. This is not the first time I've stood in front of a jury for a heinous crime, and there's always a judge; there's always a court reporter; there's always a defendant; there's always defense attorneys; there's always prosecutors; and there's always a preacher. I don't know why we always have to have a preacher, and everybody who gets in jail and gets into trouble has got to find the Lord. And I am not disparaging a true and fundamental belief in God or Jesus Christ, or whatever god you believe in. I will express some reservations. I will disparage acute onset religion, where people try to use Almighty God just like a monkey wrench, when you're in trouble, you've got to have it, you go get it; and when the pipe's fixed or when the trouble's over, you put it right back and forget until the next time you need it.

The prosecutor then made the ensuing remarks:

His salvation and what Almighty God does to him for what he's done does not concern us, for society has a right to demand that he pay a price for the events that he has done. Is the appropriate price life imprisonment, and 10 years or 15 years or ever how long it is, seven years or five years, when a bunch of little boys are sitting around the Christmas table thinking, "Is that all that jury thought of my mama and daddy because that man is sitting off somewhere eating Christmas turkey dinner?"

Thereafter, the prosecutor discussed premeditation and Cargill's lack of regard for human life; assailed the descriptions of Cargill as cordial and kind; addressed the magnitude of the crime; and described the function of the verdict form. He then spoke about aggravating and mitigating factors. As to the latter, the prosecutor said:

Mitigation—and notice the things that we're talking about don't affect the crime. They just either heighten the severity of it because of what the person is or lighten the impact of it.

15

The Judge is going to charge you about this. Mitigation, and you're to consider mitigating factors. Now, what mitigating factors you have in this case, I don't know. [Defense counsel] is going to tell you. But you're to consider the aggravation, the evidence in aggravation, the evidence in mitigation....

Next, the prosecutor stated:

When [defense counsel] gets up here, he is going to encourage you to give a sentence of life in the penitentiary. Why is this not appropriate? I've touched on it before. Some people by their acts, and I'm not getting into that textbook stuff, have merely forfeited their right to live. They have shown a heart—and this is once again the language that Judge McCombs gave you, a heart so abandoned, so malignant, that is the only appropriate punishment. I'm not telling you that a life sentence in a Georgia penitentiary is any piece of cake. If you put a defendant in with young prisoners, he's going to tell them how to do it, pass off his poison to them. Let me ask you this. How would you like to be a correctional officer in an institution with that man in there with a life sentence and knowing he wanted to leave?

The prosecutor continued, stating that the jury's sympathies should side with the victims and their families, and not Cargill. His final remarks again stressed the importance of deterrence.

2. Standard of Review

"Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury. For this reason, misconduct by the prosecutor ... must be scrutinized carefully." *Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir.1985) (*en banc* ), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). Improper prosecutorial arguments will not compel habeas corpus relief, however, unless they rendered the defendant's sentencing proceeding "fundamentally unfair." *Brooks v. Kemp,* 762 F.2d 1383, 1400 (1985) (*en banc* ), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), *reinstated,* 809 F.2d 700 (11th Cir.) (*en banc* ), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987). In making this inquiry, we must determine whether the improper comments "were so egregious as to create a reasonable probability that the outcome was changed because of them." *Brooks,* 762 F.2d at 1403. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Wilson v. Kemp,* 777 F.2d 621, 623 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). "If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."

16

*Tucker v. Kemp,* 802 F.2d 1293, 1296 (11th Cir.1986) (*en banc* ), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).

In applying this standard, we remain aware of the primary importance of examining the entire context of the trial proceeding. *Brooks,* 762 F.2d at 1413. Thus, a reviewing court should not assess prosecutorial comments in isolation, shorn of their context. *See Johnson v. Wainwright,* 778 F.2d 623, 631 (11th Cir.1985) (evaluating challenged comments in light of "the rest of the prosecutor's speech"), *cert. denied,* 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). "In this regard, isolated or ambiguous or unintentional remarks must be viewed with lenity." *Brooks,* 762 F.2d at 1400. We also consider the lack of an objection in examining the impact of a prosecutor's closing argument, as the omission "may demonstrate defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging." *Brooks,* 762 F.2d at 1397 n. 19; *see also Davis v. Zant,* 36 F.3d 1538, 1551 n. 20 (11th Cir.1994) ("The failure to object can sometimes serve to clarify an ambiguous record as to whether a particular argument was in fact misleading or prejudicial."). This court also evaluates whether "defense counsel's closing argument ... ameliorate[d] the damage done to the defense by the prosecutor's [statements]." *Davis,* 36 F.3d at 1551; *see also Brooks,* 762 F.2d at 1397-98. Moreover, we consider the trial court's instructions to the jury, as they "may remedy effects of improper comments." *Brooks,* 762 F.2d at 1400. And, of course, we consider the evidence of guilt and the weight of aggravating and mitigating factors. *See Brooks,* 762 F.2d at 1415-16. "A court need not determine whether specific arguments are proper or improper if, taken as a whole, they would not require relief." *Brooks,* 762 F.2d at 1403 n. 31. With this standard of review in mind, we address Cargill's specific allegations.

3. Specific Allegations

a. Opening Statement at the Guilt Phase

Cargill correctly argues that the prosecutor made three improper remarks during the opening statement of the trial.[19] As the Georgia Supreme Court held on direct appeal,

> [i]t was highly improper for the prosecuting attorney to have stated in opening argument that Richard Whitley "got involved with these folks according to the best information we have on discussing some problem he had with a former wife and that he wanted this former wife killed." The implication here was that Whitley got involved with the appellant because he wanted his wife killed.

*Cargill,* 340 S.E.2d at 909. The prosecutor never offered any evidence of this allegation, and, in any event, "[t]his constituted a reference to an unrelated crime, and it would certainly appear that evidence of this crime would not be admissible in this trial." 340 S.E.2d at 909. Similarly,

> it was improper for the prosecuting attorney to have stated in opening argument that, "[t]hey [police] ... went over and told the defendant that Tommy had told them ... that the defendant had shot the folks without any reaction for a long period of time." Such hearsay testimony was never sought to be introduced, and it is highly questionable whether it would be admissible for its nonhearsay aspects....

340 S.E.2d at 909 (alterations and first two ellipses in original). The third comment about which Cargill complains—that a number of witnesses did not come forward until after his arrest because they feared him—was also improper, "although not to the same degree as the statements previously reviewed." 340 S.E.2d at 909. "Although this [comment] is not at all difficult to believe, no evidence [to support it] was introduced." 340 S.E.2d at 909.

We note that Cargill's trial counsel did not object to any of these remarks, and thus "the trial court was not given an opportunity to admonish the prosecuting attorney and give appropriate

---

[19]Cargill argues that these improper comments "alleged [his] involvement in various violent, dangerous activities" and therefore infected the jury's determination as to sentencing. Again, we consider the context of the entire judicial proceeding, and prosecutorial improprieties at the guilt phase can affect the jury in its sentencing determination. *See Brooks,* 762 F.2d at 1403 n. 30.

corrective instructions to the jury." 340 S.E.2d at 910.[20] Moreover, during his opening statement, the prosecutor asserted that:

> Opening statements are not evidence. I am not a witness to anything that will be testified to. I did not see the crimes, was not a part of the investigation other than perhaps giving a little advice, legal advice, "Do you have to do this; do you have to do that?" that you won't even hear about. [The other lawyers in this case] ... are not witnesses. What we do at this juncture of [this] trial, or any other trial, is come before you and tell you what we expect [the] evidence to show from having talked to an[d] interviewed witnesses.... [T]he purpose of this opening statement is not to be evidence but to allow you to follow the evidence.

Similarly, during his opening Cargill's counsel twice told the jury that the opening statements did not constitute evidence. On the second occasion, he admonished the jury that "[w]hat you've just heard from us is not evidence at all."[21] At the guilt phase, the trial judge instructed the jury that "[e]vidence includes all the testimony of the witnesses and the exhibits admitted during the trial. It does not include the indictment or the opening statements and closing arguments by the attorneys." At the sentencing phase, the judge instructed the jury that in making its sentencing determination

---

[20]Despite the lack of objection, the Georgia Supreme Court reviewed these remarks to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." O.C.G.A. § 17-10-35(c)(1) (1982). The court found that "[t]he evidence as to the appellant's guilt was overwhelming, and showed that the appellant cold-bloodedly and remorselessly executed two individuals in order to eliminate them as witnesses to an armed robbery." 340 S.E.2d at 910. The court concluded that the remarks "were not so prejudicial, offensive, or egregious as to require a reversal of the death sentence" on the basis of section 17-10-35(c)(1). 340 S.E.2d at 910. In this appeal, the appellee makes no procedural default argument concerning these instances of prosecutorial misconduct; rather, he addresses the allegations on the merits.

Cargill's counsel did not lodge objections during the prosecutor's opening statement and closing arguments at least in part due to concerns about decorum. "Such courtesy should not be maintained in the face of an improper ... argument; errors can be cured more easily by a trial court following instantaneous objection than by a reviewing court laboring to discern the effect of printed words upon an unseen jury." *Brooks,* 762 F.2d at 1397 n. 19.

[21]Both lawyers also made similar statements during their closing arguments at the guilt phase of the trial. Cargill's counsel stated that "what we [the lawyers] say to you, as a reminder, is not evidence." The prosecutor also reiterated that "[w]hat I've said is not evidence."

Cargill's counsel did not address any of these three remarks—and the prosecutor's failure to substantiate them—during his closing argument at the guilt phase. Given the content of the remarks, this may have been a wise tactical decision.

19

it was "authorized to consider all the evidence received here in court in both stages of the proceedings presented by the state and the defendant."

In short, no question exists that these three remarks were improper. Several circumstances, however, lead us to believe that they were not overly prejudicial. First, defense counsel failed to object to any of the comments. Second, both the prosecutor and defense counsel clearly and repeatedly stated that their opening and closing remarks did not constitute evidence. Finally, the trial court gave distinct instructions to the same effect.

b. Closing Argument at the Sentencing Phase

i. Potential Comment on Parole

Cargill's most vehement objection is to the following remarks of the prosecutor:

His salvation and what Almighty God does to him for what he's done does not concern us, for society has a right to demand that he pay a price for the events that he has done. Is the appropriate price life imprisonment, and 10 years or 15 years or ever how long it is, seven years or five years, when a bunch of little boys are sitting around the Christmas table thinking, "Is that all that jury thought of my mama and daddy because that man is sitting off somewhere eating Christmas turkey dinner?"

Cargill argues that "[t]he clear insinuation of these comments was that the jury could not count upon a life sentence resulting in imprisonment for life." According to Cargill, the prosecutor "intentionally and pointedly argued to the jury that its choice was not between life imprisonment and death, but rather between perhaps as few as five years' imprisonment and death." Thus, Cargill believes, the prosecutor improperly "commented on the possibility of parole," and this comment was misleading because under O.C.G.A. § 42-9-39(c) consecutive life sentences for each of his four felonies would have rendered him ineligible for parole for at least thirty years.[22]

_____

[22]"When a person receives consecutive life sentences as the result of offenses occurring in the same series of acts and any one of the life sentences is imposed for the crime of murder, such person shall serve consecutive ten-year periods for each such sentence, up to a maximum of 30 years, before being eligible for parole consideration." O.C.G.A. § 42-9-39(c) (Supp.1984).

20

We reject Cargill's interpretation of these remarks for several reasons.[23] First, the prosecutor's remarks were not an inaccurate comment on the applicable state law. As the state habeas corpus court found, Cargill "had been charged with two counts of murder and two counts of armed robbery. The minimum sentence allowed by law for armed robbery in Georgia is five years imprisonment. O.C.G.A. Sec. 16-8-41(b)." Therefore, as the court further determined, "a life sentence for murder *and* from 15 to five years in prison would not be an inaccurate statement of the law."[24] That is, of course, exactly what the prosecutor said—"Is the appropriate price life imprisonment, *and* 10 years or 15 years or ever how long it is, seven years or five years ... ?" We are not at liberty to challenge this state court determination of state law. *McBride v. Sharpe,* 25 F.3d 962, 972 (11th Cir.) (*en banc* ), *cert. denied,* 513 U.S. 990, 115 S.Ct. 489, 130 L.Ed.2d 401 (1994).

Moreover, a fair reading of the challenged remarks reveals that the prosecutor was attempting to convey the gravity of the crime and its consequences—the murder of the Williamses left four young boys without parents—to convince the jury that life imprisonment, *i.e.,* allowing Cargill to continue to live, would be too lenient a sentence. The "proportionality" argument was a consistent theme throughout the prosecutor's closing. Later in his speech, for example, he stated:

> If you have to show some compassion, show some compassion for a family that has lost two members for absolutely no reason. If your heart has to go out to somebody, let it go out to a society that you represent that demands that this defendant receive that appropriate punishment and not that he be given, compared to the crime he committed, what amounts to more than a judicial slap on the wrist, a sentence of life imprisonment. *A sentence of life is a sentence of life.* There's no difference between this one and one that's done an armed robbery that has not taken life, to a rapist, to any—to a murderer who has not shown a mind so depraved as this one.

Here the prosecutor made an argument comparable to the remarks Cargill challenges—that the gravity of the offense warrants a death sentence; a sentence of life imprisonment, *i.e.,* letting Cargill

---

[23]Preliminarily, we note that Cargill must base his argument on insinuation because, as the state habeas corpus court accurately expressed, "[n]o mention was made by the prosecutor of pardon, parole or other clemency."

[24]The judge could impose concurrent sentences for the armed robbery counts to run consecutively to concurrent life sentences for the murder counts. We note that the court sentenced Cargill to twenty years of imprisonment on each of the armed robbery counts.

live, is too light. We also note that the prosecutor made another remark in his closing—"I'm not telling you that a life sentence in a Georgia penitentiary is any piece of cake"—that appears to contravene Cargill's thesis. We remain mindful of the guideline adopted in *Brooks* that ambiguous prosecutorial remarks "must be viewed with lenity." 762 F.2d at 1400.[25]

In addition, we note that Cargill's counsel did not make a contemporaneous objection to the challenged remarks. Instead, defense counsel waited to object and move for a mistrial until after the prosecutor had finished his closing argument, defense counsel had given his closing argument, the court had rendered its jury instructions and the jury had retired to deliberate. Furthermore, the closing argument of Cargill's counsel was ameliorative:

> The district attorney, as you heard, stated that David Cargill showed no mercy; so no mercy on him. And I submit to you that a sentence of life imprisonment is not showing mercy. *It is a sentence of imprisonment for the rest of his life.* When he first was arrested, he was tan and robust. You have heard from the testimony that he has changed dramatically. As you can see now, he's a bleached and worn shadow of what he previously was, even being here in the county jail. Being sentenced to the penitentiary, as even the district attorney in the way he characterized it, is no bed of roses. *It's a very harsh and severe penalty; and if such a sentence is voted by you, that does accomplish what the district attorney is asking, and that is that he has forfeited his right to be among us. That is, he will be, by your verdict of life imprisonment, placed in prison for the remainder of his natural life.* You would accomplish that goal which the district attorney has asked you to.

*See Tucker v. Kemp,* 762 F.2d 1496, 1509 (11th Cir.1985) (*en banc* ), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3340, 92 L.Ed.2d 743 (1986) (prosecutor's improper argument that parole board would release defendant prematurely "was effectively countered by defense counsel's argument that [the defendant] would probably never be released again"). Also, the court instructed the jury concerning life imprisonment as follows:

> Now, members of the jury, you may return any one of two verdicts as to penalty in this case. Life imprisonment, you may return a verdict which reads, "We, the jury, fix the penalty at life imprisonment," in which event the defendant would be sentenced to serve *the remainder of his life in the penitentiary.*

---

[25]"[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Donnelly v. De Christoforo, 416 U.S. 637, 647, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974).

Accordingly, we do not agree with Cargill's assertion that "none of the factors that minimize prejudice" exists here. Indeed, after a thorough review of the full context of the sentencing proceeding, we conclude that the prosecutorial remarks at issue were not prejudicial.[26]

ii. Invocation of Prosecutorial Expertise

Cargill next argues that the prosecutor improperly invoked his "prosecutorial expertise" in asking the jury to believe that this case was appropriate for the death penalty.

(a) First Example

The first improper instance here was, as Cargill describes it, that "[t]he prosecutor told the jury that based, *inter alia,* on "experience ... we feel [death] to be the appropriate punishment.' " Cargill pulls the prosecutor's assertion out of its setting. The actual context of this statement was as follows:

> You will have to elect or select between the death penalty and the life sentence. We are obviously encouraging the death penalty. That is no revelation. We are going to make some remarks to you and show you, based on experience, based on the circumstances of this crime, based on the circumstances of this defendant why we feel this to be the appropriate punishment.

Viewed in their totality, these remarks were not improper. We agree with the appellee that "the prosecutor was merely prefacing the underlying bas[e]s on which a death sentence should be imposed and clearly let the jury [know] that it was a decision for the jury to make." Consequently, these remarks cannot contribute to Cargill's constitutional claim. *See Brooks,* 762 F.2d at 1403 (comments that are not improper "can never be unconstitutional").

(b) Second and Third Examples

Cargill's argument as to two other comments, however, has more force. Cargill accurately asserts that the prosecutor had no record support for his statement that "[s]o seldom do we see crimes so cold-blooded and not one but two bullets fired into the heads." This remark, "invoking the expertise of the prosecutor to suggest the special seriousness of the crime, was improper."

---

[26]We hold only that these comments were not prejudicial in the context of this case. We acknowledge that under different circumstances such remarks could have a misleading effect on a jury.

23

*Tucker,* 762 F.2d at 1505; *see also Brooks,* 762 F.2d at 1413 ("The argument improperly suggested that the prosecutor had canvassed all murder cases and selected this one as particularly deserving of the death penalty...."). We note, however, that although Cargill's counsel objected (not contemporaneously, but after the jury had retired to deliberate) to several alleged instances of the prosecutor's "comment[ing] upon ... evidence he did not introduce," this was not one of them. This, as well as other factors discussed below, indicates to us that the remark—considered in the context of the prosecutor's entire closing argument—did not have much, if any, prejudicial effect.

Cargill also argues that the prosecutor improperly invoked his expertise when making the following commentary:

> [A]nd then we came to the preacher. This is not the first time I've stood in front of a jury for a heinous crime, and there's always a judge; there's always a court reporter; there's always a defendant; there's always defense attorneys; there's always prosecutors; and there's always a preacher. I don't know why we always have to have a preacher, and everybody who gets in jail and gets into trouble has got to find the Lord. And I am not disparaging a true and fundamental belief in God or Jesus Christ, or whatever god you believe in. I will express some reservations. I will disparage acute onset religion, where people try to use Almighty God just like a monkey wrench, when you're in trouble, you've got to have it, you go get it; and when the pipe's fixed or when the trouble's over, you put it right back and forget until the next time you need it.

Defense counsel objected to these comments, though in a non-contemporaneous fashion. Assuming *arguendo* that this commentary was improper, but see *Bowen v. Kemp,* 769 F.2d 672, 680 (11th Cir.1985), *reinstated in relevant part,* 832 F.2d 546, 547 n. 2 (11th Cir.1987) (*en banc* ), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988), its prejudicial effect is far from clear. Although the prosecutor should not have referenced his experience and other cases not in evidence, we agree with the appellee that the thrust of his statements was "to focus the jury's attention on whether [Cargill's] invocation of religion was genuine." This, of course, was a legitimate subject for the prosecutor to address.

On the whole, we are convinced, after reviewing the totality of the prosecutor's closing argument, defense counsel's closing and the court's instructions to the jury, that "the jury labored under no misperception as to its role; the jury clearly understood that it alone bore the responsibility for deciding whether [Cargill] should live or die." *Brooks,* 762 F.2d at 1414.

24

iii. Comments on Mitigating Evidence

Cargill also contends that "the prosecutor falsely and improperly told the jury that the information Mr. Cargill offered during the sentencing phase did not constitute mitigating evidence." Cargill cites three allegedly violative instances, two of which we emphasize in the following excerpt:

> We brought on Sheriff John Adams who told you about the defendant's reputation, and that reputation was bad, for turbul[e]nce and violence. That's what we have to call fighting and stabbing and cutting and that kind of thing. It's a bad reputation. We—he also testified as to the defendant's reputation on things like larceny and so forth. We did get the one sister to come out and say finally, tell you about his drug abuse. Now, that's what you're passing on. This is the good old boy that you're going to be passing on. His mother loves him. *That is not evidence.* She begged for him. If you wanted begging, we could've given you some begging; but that's not the way it ought to be done.
>
> ... The defendant's sister said she knew of that fine he was to pay in January in Harris County. His mother testified. She told us he was a good little boy. She didn't tell us anything about once he grew up. But we had emphasized some things that we already knew, that he was a dog-fighter, a compassionate sport.... And she further testified that he only cut his brother one time. That's because he was coming at him with a tire tool, just one time.
>
> He had his sister up there. He helped her move out. He gave her money. Look, this is blood. And there's not a crime in this world that blood is going to overlook, is not going to mitigate, is not going to say does not deserve some special treatment, no matter what anybody does. *So the mere fact that that happens proves nothing.*

We also put forth the third statement to which Cargill objects in its broader context:

> Mitigation—and notice the things that we're talking about don't affect the crime. They just either heighten the severity of it because of what the person is or lighten the impact of it. The Judge is going to charge you about this. Mitigation, and you're to consider mitigating factors. *Now, what mitigating factors you have in this case, I don't know.* [Defense counsel] is going to tell you. But you're to consider the aggravation, the evidence in aggravation, the evidence in mitigation....

We are not surprised that Cargill's counsel never objected to these statements. These comments conveyed no prejudicial message to the jury—only that the mitigating evidence Cargill presented was of little force. We also note that the prosecutor went on to say, in discussing aggravating and mitigating factors, that

> [t]here is not a question, there is not a doubt but that [Cargill] was engaged in an armed robbery while he committed the two murders, and that he was engaged in a murder when he committed the murder.

25

Well, if that's the case, does that end it? No, because for any reason or no reason, mitigating factors, if you can find them from this evidence, from the crime that was committed, from what was presented to you by the defense in this case, mitigating factors can wipe out these statutory aggravating circumstances and you are not bound, even though they are there to give the death penalty. You can say, "This crime appropriately merits a life sentence in spite of all that has gone on since Monday morning at 9 o'clock [the time the trial commenced]." You are a jury.

Moreover, the trial court clearly instructed the jury members that the responsibility of finding "any mitigating or extenuating facts and circumstances" rested with them. We conclude that Cargill's contentions lack merit.

iv. Comment on Future Dangerousness

Cargill's final argument under this claim is similarly meritless. He asserts that the prosecutor made an improper reference in asking the jury, "How would you like to be a correctional officer in an institution with that man in there with a life sentence and knowing he wanted to leave?" In *Tucker v. Kemp,* 762 F.2d 1480, 1486 (11th Cir.) (*en banc* ), *vacated on other grounds,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *reinstated,* 802 F.2d 1293 (11th Cir.1986) (*en banc* ), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987), this court held that a prosecutor's similar remarks to the jury—"Now what about the guards who would be guarding him down there? The guards would be, of course, exposed to him[ ]"—constituted "an appropriate means of pointing out the possibility of Tucker's future dangerousness and did not call for a speculative inquiry into prison conditions."

4. Conclusion

The prosecutor made three improper remarks during his opening statement in the guilt phase of the trial. While these comments prejudiced Cargill, we are convinced that the prejudice was not so severe as to render the trial unfair. First, the remarks did not compel Cargill's counsel to object to them, either contemporaneously or before the commencement of the taking of evidence. Second, both the prosecutor and Cargill's counsel told the jury that their comments during opening statements and closing arguments did not constitute evidence. Third, the court clearly instructed the jury that the lawyers' comments did not comprise evidence.

26

We have also found one instance where the prosecutor improperly invoked his expertise and assumed the impropriety of another such invocation. We are satisfied, however, that these remarks prejudiced Cargill only slightly, if at all. Indeed, the comment that we have held improper did not bring an objection from Cargill's counsel. After considering the totality of the prosecutor's closing argument, defense counsel's closing and the court's jury instructions, we have no doubt that the jury understood that it had to base its sentencing determination on the evidence presented—with no regard for the prosecutor's closing argument.

We agree with the Georgia Supreme Court that the state presented "overwhelming" evidence of Cargill's guilt. Cargill's testimony and alibi defense were wholly unbelievable. Moreover, Cargill did not advance forceful mitigation evidence at the sentencing phase of the trial. And, "[a]lthough the instant case is not among the most egregious cases in which the death penalty has been imposed, neither is it among the least egregious." *Brooks,* 762 F.2d at 1416.

In sum, after conducting an exhaustive review of the record in this case, we conclude, confidently, that had the prosecutor not made the improper comments identified above, the jury would have rendered the same verdict as to Cargill's sentence. Cargill's sentencing proceeding was not fundamentally unfair.

C. Ineffective Assistance of Counsel at the Sentencing Phase

Next, we address Cargill's contention that his counsel rendered ineffective assistance during the sentencing phase of his trial. Cargill argues that his lawyers failed to conduct a reasonable investigation into his background and thus "failed to uncover a massive amount of mitigating evidence."[27] Whether counsel provided ineffective assistance presents a mixed question of fact and law, over which we have plenary review. *Baxter v. Thomas,* 45 F.3d 1501, 1512 (11th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995).

"An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Middleton v. Dugger,* 849 F.2d 491,

---

[27]Cargill admits that his mother and sister knew "most of this evidence."

493 (11th Cir.1988). Contrary to Cargill's assertions, his trial counsel did not fail to undertake a reasonable investigation in the constitutional sense. After conducting a full and fair evidentiary hearing—at which Cargill's current counsel did not pursue this specific claim with great vigor—the state habeas corpus court found that:

> Counsel obtained names from Petitioner, from Petitioner's mother and from Petitioner's sister. The record shows that [lead defense counsel] presented the testimony of the Petitioner's mother; Petitioner's sister Marsha Cannon; neighbor Rudolph Morris; a friend Lloyd Dupree; and Reverend Steve Vann who had ministered to Petitioner while Petitioner was incarcerated. Counsel had also subpoenaed some individuals who ultimately were not utilized at trial as they were either "not helpful or declined to assist us...." These included Ken Braswell, who when asked to testify on Petitioner's behalf indicated he did not want to be involved; Donny and Donna Ballard who "just flat told us they would not come"; Randall Colter "would not come to the phone"; Wilbur Trim; Leroy Napier; Jerry Beckwith who "did not want to get involved"; and Petitioner's father, Lawrence Cargill, Sr., who was present at trial but who "had a physical handicap" ... [and] either was not physically able or ... did not think he was physically able to testify.... [Lead defense counsel] "attempted to contact everybody we thought would be helpful, and it just seems like there were a couple we couldn't get hold of.... There were one or two, but most of them talked to me." [Cargill's other lawyer] did try to contact one potential mitigating witness whose name was given him by Petitioner's sister, Marsha Cannon. The individual was identified as having grown up with Petitioner and would say he was "okay" but when asked about Petitioner, she indicated that Petitioner "hit my husband in the head with a gun once"[;] that was all the individual knew and counsel elected not to call her.

(Citations omitted.) We accord these findings the presumption of correctness. *See* 28 U.S.C. § 2254(d) (1994). In the circumstances of this case, the investigation Cargill's trial counsel performed was "not outside the wide range of professionally competent assistance." *Middleton,* 849 F.2d at 493; *see also Burger v. Kemp,* 483 U.S. 776, 794-95, 107 S.Ct. 3114, 3125-26, 97 L.Ed.2d 638 (1987). Consequently, Cargill's ineffective assistance claim fails.

D. *Batson* and *Powers* Claim

Cargill also alleges that the prosecutor "purposefully discriminated against blacks in the selection of the petit jury" through his use of peremptory challenges and thus violated the Fourteenth Amendment pursuant to *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Cargill's conviction became final on February 23, 1987, the date the United States Supreme Court denied his petition for a writ of *certiorari* on direct appeal. *See Griffith v. Kentucky,* 479 U.S. 314, 321 n. 6, 107 S.Ct. 708,

28

712, 93 L.Ed.2d 649 (1987). Therefore, the rule of *Powers*—that under the Equal Protection Clause a defendant has standing to object to race-based exclusion of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same race—only applies to Cargill if it has retroactive effect. As Cargill concedes, this court has held that *Powers* "announced a "new rule' of law that could not be applied retroactively on collateral review." *Farrell v. Davis,* 3 F.3d 370, 372 (11th Cir.1993). Cargill asks this panel to revisit *Farrell;* this we cannot do. The law of this circuit is "emphatic" that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision. *United States v. Woodard,* 938 F.2d 1255, 1258 (11th Cir.1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992).

E. "Cumulative Error" Claim

Finally, because we believe that Cargill's state-court trial was not fundamentally unfair, we decline his invitation to entertain a "cumulative error" claim as discussed in *Derden v. McNeel,* 978 F.2d 1453, 1456-61 (5th Cir.1992) (*en banc* ), *cert. denied,* 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993), and *Walker v. Engle,* 703 F.2d 959, 963-69 (6th Cir.), *cert. denied,* 464 U.S. 951, 104 S.Ct. 367, 78 L.Ed.2d 327 *and* 464 U.S. 962, 104 S.Ct. 396, 78 L.Ed.2d 338 (1983).

## IV. CONCLUSION

After carefully reviewing the record in this case, we conclude, for the foregoing reasons, that Cargill's trial was not constitutionally deficient and that his claims lack merit. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

KRAVITCH, Senior Circuit Judge, concurring in part and dissenting in part:

I concur in the portions of the majority opinion affirming the district court's denial of habeas relief with respect to Cargill's convictions. I respectfully dissent, however, from the majority's affirmance of the denial of habeas relief as to sentencing because I disagree with the majority's treatment of what, in my view, were improper closing remarks made by the prosecutor. Because I

29

conclude that these improper closing remarks rendered the sentencing proceeding fundamentally unfair, I would reverse the district court's denial of relief as to sentencing.

During the sentencing phase of Cargill's trial, the prosecutor told the jury:

[Cargill's] salvation and what Almighty God does to him for what he's done does not concern us, for society has a right to demand that he pay a price for the events that he has done. *Is the appropriate price life imprisonment, and 10 years or 15 years or ever how long it is, seven years or five years,* when a bunch of little boys are sitting around the Christmas table thinking, "Is that all that jury thought of my mama and daddy because that man is sitting off somewhere eating Christmas turkey dinner?"

(Tr. 1426-27) (emphasis added). The majority reads these remarks as referring not to the possibility of Cargill's release on parole within five to fifteen years but rather to the fact that Cargill, if sentenced to life by the jury for murder, could receive an additional sentence for armed robbery of between five and fifteen years, as determined by the judge. Because the majority reads the quoted passage as accurately stating Georgia law, it concludes that the prosecutor's remarks were neither improper nor prejudicial. I respectfully disagree.

I concede that the majority's technical parsing of the prosecutor's closing argument is plausible. I cannot agree, however, with the majority's assertion that the quoted remarks were not improper. If the prosecutor intended to refer to Cargill's possible release on parole, the remarks clearly would have been improper. *See* Ga.Code Ann. § 17-8-76(a) (1990) (prohibiting attorneys from informing jurors of the possibility of clemency, pardon, or parole).[1] Even if the prosecutor intended to refer only to the additional sentence that Cargill would receive for armed robbery, I doubt that a jury of lay persons, without further explanation, would have understood this reference. Rather, I believe that these remarks created a substantial danger that a jury would be misled into

---

[1]Since Cargill's trial, the Georgia legislature has authorized argument to the jury on the issue of parole in the sentencing phase of death penalty trials. *See* Ga.Code Ann. § 17-10-31.1(d) (1993); *Jenkins v. State,* 265 Ga. 539, 458 S.E.2d 477, 478 (1995). Even under this new statute, however, it would be improper to mislead a jury as to the length of time a defendant would be required to serve before becoming eligible for parole.

30

believing that, if sentenced to life, Cargill could be released from prison after serving as few as five years.[2]

The prosecutor questioned: "Is the appropriate price life imprisonment, and 10 years or 15 years or *ever how long it is,* seven years or five years ... ?" Because the prosecutor made this statement without any reference to an additional sentence for the armed robbery counts, I do not believe that a jury untrained in the technicalities of Georgia's sentencing procedure would focus, as the majority does, on the prosecutor's use of the word "and." It thus seems unlikely that a jury would have understood the prosecutor's remarks as referring to a previously unmentioned sentence for armed robbery.[3]

Moreover, the prosecutor implied that if sentenced to life, Cargill would be released on parole and would be "off somewhere eating Christmas turkey dinner" at the same time "a bunch of little boys" (the victims' children) were wondering why the defendant was released. By referring to a "bunch of little boys," the prosecutor implied that the defendant would be released ("off somewhere") in a relatively short period of time—for if Cargill served the time required by Georgia law prior to becoming eligible for parole, the victims' children hardly would be the "bunch of little boys" the prosecutor described. In addition, the inference that the defendant would be released after serving only a small fraction of the life sentence was reinforced by the prosecutor's reference to life imprisonment as a "judicial slap on the wrist." (Tr. 1439).[4] Because these statements created a

[2]Georgia law required that had Cargill been given consecutive life sentences on each of the four felonies for which he had been convicted, he would have been ineligible for parole for at least 30 years. Ga.Code Ann. § 42-9-39(c) (1994).

[3]During the sentencing hearing, neither the judge nor the prosecutor referred to this additional sentence for the armed robbery counts. Instead, the prosecutor simply referred to the choice between "the death penalty and the life sentence," (Tr. 1413), and the judge instructed the jury that it was its "duty to determine within the limits prescribed by law what punishment will be imposed for [the] offense [of murder]." (Tr. 1458).

[4]In urging the jury to choose the death penalty over life imprisonment, the prosecutor also told the jury: "I submit to you that criminals who go out and do these acts, number one, feel like that they are so smart they'll never get caught; and, number two, they'll be punished in a *very modest fashion.* It will be an *inconvenience,* just like the overhead for a business, paying the electric bill, and he will try it over and over again." (Tr. 1418) (emphasis added). These

substantial likelihood that the jury was misled into believing that a sentence of anything less than death could result in Cargill's release from prison in as few as five years, I conclude that the prosecutor erred in placing them before the jury. As the majority notes, however, improper prosecutorial argument does not entitle a habeas petitioner to relief unless there is a "reasonable probability that, but for [the improper] arguments, the death verdict would not have been given." *Brooks v. Kemp,* 762 F.2d at 1413. A "reasonable probability" is a probability sufficient to undermine confidence in the jury's verdict. *Wilson v. Kemp,* 777 F.2d 621, 623 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). Relying mainly on the supposed ameliorative effect of the defense counsel's closing argument and the trial court's instructions to the jury, the majority concludes that the prosecutor's remarks did not prejudice Cargill. I cannot join this conclusion.

In my view, neither Cargill's counsel nor the trial court effectively dispelled the misimpression created by the prosecutor that Cargill's "life sentence" could last as few as five years. In urging the jury to choose life, defense counsel referred to a "sentence of imprisonment for the rest of his life." (Tr. 1448-49). With such a verdict, defense counsel noted, the defendant would be "placed in prison for the remainder of his natural life." (Tr. 1449). These statements describe the option of a "life sentence" in generic terms, and thus do little to rebut the prosecutor's suggestion that Cargill would be released from prison in "10 years or 15 years, or ever how long it is, seven years or five years." Importantly, defense counsel made no reference to Cargill's period of ineligibility for parole or to a specific period of confinement because he was barred from doing so. Only the prosecutor referred to the number of years that Cargill might actually be required to serve, and I do

references reinforced the erroneous impression that a life sentence would result in a relatively short period of incarceration. The fact that the prosecutor later stated that "I'm not telling you that a life sentence in a Georgia penitentiary is any piece of cake," (Tr. 1437), does not in my view negate the impression that Cargill would be released within five to fifteen years.

not believe that defense counsel's references to the harshness of a life sentence erased from the jury's mind the impression that Cargill could be released in as few as five years.[5]

Similarly, the trial court's instructions did not counteract the impression that Cargill would be required to serve only a small fraction of a life sentence. The trial court merely instructed jurors that if they were to fix the penalty at life imprisonment "the defendant would be *sentenced to serve* the remainder of his life in the penitentiary." (Tr. 1462) (emphasis added). Because this instruction said nothing about how much of a life sentence Cargill would actually be *required to serve* before becoming eligible for parole, it did nothing to dispel the misimpression created by the prosecution. The trial court could have effectively negated the damage by informing the jury that the prosecutor's remarks referred to an additional sentence for armed robbery that it would impose. Despite an objection by Cargill's counsel, the trial court did not take this precautionary step.[6] As a result, the jury was left with the erroneous impression that "life imprisonment" amounted to nothing more than a "judicial slap on the wrist."

In my view, the unrebutted remarks of the prosecutor created an unacceptable risk that the jury sentenced Cargill to death because it misunderstood its sentencing options. Throughout his closing argument, the prosecutor stressed to the jury that in choosing between the death sentence and life imprisonment it had the duty to choose the "appropriate" punishment. Because of the improper remarks, however, the jury was left with a false choice: sentence a convicted double murderer to death or grant him the chance of being released from prison within five years. Given only these two options, it is hardly surprising that the jury chose the death penalty. *Cf. Simmons v. South Carolina,* 512 U.S. 154, 161-63, 114 S.Ct. 2187, 2193, 129 L.Ed.2d 133 (1994) (defendant denied due process

---

[5]This circuit has recognized that "[a]rguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury." *Drake v. Kemp,* 762 F.2d 1449, 1459 (1985) (*en banc* ), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986).

[6]Cargill's counsel brought the improper statements to the court's attention immediately after the jury charge and, at that time, moved for a mistrial. In addition, at the beginning of the sentencing hearing, Cargill sought to introduce evidence of his ineligibility for parole. In accordance with Georgia law, the trial court denied this request.

33

because sentencing jury was provided with "false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration").[7]

The availability of alternative punishments undoubtedly affects the manner in which a capital sentencing jury reaches its decision. Researchers have found that the number of years a jury believes a defendant will actually serve if sentenced to life is a vital factor in a jury's decision to choose life imprisonment instead of the death penalty. *See Simmons,* 114 S.Ct. at 2191, 512 U.S. at 157-58 (citing study in which more than 75% South Carolina citizens indicated that the amount of time the convicted murderer actually would have to spend in prison would be "extremely important" or "very important" factor in choosing between life and death); James Luginbuhl and Juile Howe, *Discretion in Capital Sentencing Instructions: Guided or Misguided?,* 70 Ind. L.J. 1161, 1178 (1995) (study of North Carolina jurors revealed that of jurors who sentenced defendant to death, 74% believed that he would serve less than 20 years, whereas of jurors who sentenced defendant to life, 72% believed that he would remain in prison for at least 20 years); Theodore Eisenberg and Martin T. Wells, *Deadly Confusion: Juror Instructions in Capital Cases,* 79 Cornell L.Rev. 1, 7 (1993) ("[J]urors who believe the alternative to death is a relatively short time in prison tend to sentence to death. Jurors who believe the alternative treatment is longer tend to sentence to life."); Anthony Paduano and Clive A. Stafford Smith, *Deathly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty,* 18 Colum. Hum. Rts. L.Rev. 211, 220-25 (1987) (recounting study of Georgia capital jurors in which over two-thirds indicated that they would be more likely to impose a sentence of life if assured that "life" meant at least twenty-five years).

---

[7]In *Simmons,* the Court held that a capital defendant has a due process right to inform the sentencing jury of his ineligibility for parole if the prosecution argues that he presents a future danger to society. 512 U.S. at 171-73, 114 S.Ct. at 2198.

In my view, the jury in this case, which had the discretion to choose life over the death penalty for any reason,[8] was misled with respect to an extremely important sentencing factor. It was led to believe that a convicted double murderer might walk away in five years if sentenced to life in prison. In essence, this erroneous impression stripped the jury of its sentencing discretion, and thus rendered Cargill's sentencing proceeding fundamentally unfair. Had the jury not been misled, there is a reasonable probability that at least one juror would have refused to sentence Cargill to death.[9]

Accordingly, I would reverse the district court's denial of habeas relief as to Cargill's death sentence and would remand this case to the district court with instructions to issue the writ setting aside the death sentence unless the State affords Cargill a new sentencing proceeding before a newly empaneled jury.

---

[8]The trial judge made clear in its instructions that the jury had complete discretion to choose life imprisonment over the death penalty. It stated:

> [W]hether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty in this case at life imprisonment.... You may fix the penalty at life imprisonment if you see fit to do so for any reason satisfactory to you or without any reason.

(Tr. 1461-62).

[9]Under Georgia law, if the sentencing jury does not unanimously recommend the death penalty, the trial court must impose a sentence of life imprisonment. *Hill v. State,* 250 Ga. 821, 301 S.E.2d 269, 270 (1983).