[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 11 2000
THOMAS K. KAHN
CLERK

No. 98-6222

FCC Agency No. 97-151

GULF POWER COMPANY;
ALABAMA POWER COMPANY, et al.,

Petitioners,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

No. 98-2589

FCC Agency No. 97-151

TAMPA ELECTRIC COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

No. 98-4675

_____

FCC Agency No. 98-20-FCC

FLORIDA POWER & LIGHT COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6414

_____

FCC Agency No. 98-20

COMMONWEALTH EDISON COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6430

_____

FCC Agency No. 97-151-CS

POTOMAC ELECTRIC POWER COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6431

_____

FCC Agency No. 97-151-CS

TEXAS UTILITIES ELECTRIC COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6442

_____

FCC Agency No. 97-151-CS

UNION ELECTRIC COMPANY, d.b.a. AMERENUE,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6458
_____
FCC Agency No. 97-151-CS

AMERICAN ELECTRIC POWER SERVICES CORPORATION,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6476
_____
FCC Agency No. 97-151

4

DUKE ENERGY CORPORATION,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6477
_____
FCC Agency 97-151

VIRGINIA ELECTRIC and POWER COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6478
_____
FCC Agency No. 97-151

CAROLINA POWER & LIGHT COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6485

_____

FCC Agency No. 97-151

DUQUESNE LIGHT COMPANY,

Petitioner,

versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

Respondents.

_____

No. 98-6486

_____

FCC Agency No. 97-151

DUQUESNE LIGHT COMPANY,

                                                                      Petitioner,

                                    versus

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,

                                                                   Respondents.

                              _____

                       Petitions for Review of an Order
                  of the Federal Communications Commission

                              _____

                           **(April 11, 2000)**

Before TJOFLAT and CARNES, Circuit Judges, and GARWOOD*, Senior Circuit
Judge.

TJOFLAT, Circuit Judge:

     The 1996 Pole Attachment Act, 47 U.S.C. § 224 (Supp. II. 1996) (the "1996

Act"), gives providers of cable and telecommunications services the right to attach

wires to the poles of power and telephone companies. If the power and telephone

_____

*Honorable Will L. Garwood, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

companies will not accept the rent the providers offer to pay, the Federal

Communications Commission (the "FCC" or "Commission") sets the rent. In <u>In re</u>

<u>Implementation of Section 703(e) of the Telecommunications Act of 1996</u>, 13

F.C.C.R. 6777 (1998) (codified at 47 C.F.R. §§ 1.1401 -1.1418 (1999)) ("<u>Report and</u>

<u>Order</u>"), the FCC promulgated a formula for computing that rent. The FCC also ruled

                                      7

(in the Report and Order) that the 1996 Act precluded utilities (power and telephone) from receiving rent for wires that were "overlashed" to wires previously attached to their poles;[1] that the 1996 Act gave it authority to regulate the placement of wireless communications equipment and attachments for Internet service on utility poles; and that the Act precluded utilities from receiving rent for unused wires contained within fiber optic cables, "dark fiber,"[2] attached to the poles.

In these consolidated petitions for review of the Report and Order, several power companies[3] (the "Petitioners") challenge the FCC's formula for determining rent on the ground that, when implemented, the formula will operate to take their property without just compensation, in violation of the Fifth Amendment. We decline to reach this takings claim, because it is not ripe. The Petitioners also challenge the FCC's other rulings. As to those rulings, we find unripe their challenge to the overlashing provision of the Report and Order; we hold that the FCC lacks authority

---

[1] Overlashing occurs when an attacher physically ties additional cables to cables already attached to a pole. See Report and Order, 13 F.C.C.R. 6777, 6805 (1998).

[2] Dark fiber is "bare capacity and does not involve any of the electronics necessary to transmit or receive signals over that capacity." Report and Order, 13 F.C.C.R. at 6810.

[3] The utilities involved in this proceeding either as petitioners or intervenors are Gulf Power Company, Alabama Power Company, Georgia Power Company, Southern Company Services, Tampa Electric Company, Potomac Electric Power Company, Virginia Electric & Power Company, Carolina Power & Light Company, Duquesne Light Company, Delmarva Power & Light Company, Public Service Electric & Gas Company, Houston Lighting & Power Company, Texas Utilities Electric Company, American Electric Power Service Corporation, Commonwealth Edison Company, Duke Energy Corporation, Union Electric Company, and Florida Power and Light Company.

to regulate the placement of wireless equipment on utility poles and attachments for Internet service; and that its decision regarding dark fiber constitutes a reasonable interpretation of the 1996 Act.

I.

A.

From its inception, the cable television industry has attached its cables to the utility poles of power and telephone companies.[4]   They have done so because factors such as zoning restrictions, environmental regulations, and start-up costs have rendered other options infeasible.  Despite this dearth of alternatives, the attachment agreements between cable television companies and utility companies have generally been voluntary.  But, the lack of alternatives has given the power and telephone companies an advantage in negotiating attachment agreements: their monopoly in the supply of poles that could accommodate television cables has allowed them, in the past, to charge monopoly rents.

---

[4] In 1978, when Congress decided to intervene as described in the text infra, approximately 95 percent of cable television wires were attached to utility poles because cable television companies owned less than 10,000 poles, compared to over ten million poles owned by the power and telephone companies.  See S. Rep. No. 95-580, at 12-13 (1978), reprinted in 1978 U.S.C.C.A.N. 109, 120-21.

In an effort to solve the monopoly pricing problem, Congress, in 1978, enacted the Pole Attachment Act, Pub. L. 95-234, 92 Stat. 33 (1978) (codified at 47 U.S.C. § 224 (1994)) (the "1978 Act"), as an amendment to the Communications Act of 1934. The solution Congress articulated in that act was to specify a range of rents telephone and power companies could charge the cable television companies they allowed to attach to their poles.[5] Congress' solution, in the 1978 Act, did not, however, change the voluntary nature of the attachment arrangement. As before, the cable television companies had no right to attach; thus, utilities could reject a cable television company's offer to attach. As for the attachments already in place, the 1978 Act effectively changed their terms.[6] In the event the parties could not agree to the rent and conditions of an attachment, and

---

[5] Congress expressed this range as:
> [N]ot less than the additional costs of providing pole attachments, nor more than an amount determined by multiplying the percentage of the total usable space, or the percentage of the total duct or conduit capacity, which is occupied by the pole attachment by the sum of the operating expenses and actual capital costs of the utility attributable to the entire pole, duct, conduit, or right-of-way.

47 U.S.C. § 224(d)(1) (1994). This range is more commonly expressed as not less than the incremental cost of adding a particular attachment, nor more than the fully allocated costs of the pole.

[6] Since the 1978 Act did not give the cable television companies the right to attach, the utilities could have avoided the FCC's regulation of rent and conditions of attachment under the Act by canceling the existing arrangements, and having the attachments removed. For obvious reasons, the utilities did not take this step.

10

the State chose not to regulate the terms of attachments, the FCC would settle the issue.[7]

The rule the FCC promulgated to implement its authority under the 1978 Act reflected its limited authority; that rule merely "provided complaint and enforcement procedures to ensure that rates, terms and conditions for cable television pole attachments [we]re just and reasonable." 47 C.F.R. § 1.1401 (1978). The rule set forth (1) the procedure for filing a complaint about rents or conditions of attachment, see id.; (2) factors to be considered by the administrative law judge in determining the lawfulness of the rent or conditions the utility sought, see id.; and (3) a formula for determining the maximum rent the utility could receive, see 47 C.F.R. § 1.1409. Under the formula, the maximum rent a utility could charge was the attacher's proportionate share[8] of the bare costs of maintaining the pole and the "carrying charges"[9] associated with the pole.

---

[7] The FCC already possessed regulatory authority over the telephone industry. See 47 U.S.C. § 151 (1994). The passage of the 1978 Act gave the FCC the authority to regulate power companies as well, albeit in the limited manner described in the text. See 47 U.S.C. § 224(a)-(c) (1994).

[8] The attacher's proportionate share equaled the amount of space occupied by the attacher divided by the amount of total "usable space."

[9] The FCC regulations do not define carrying charges, but according to Black's Law Dictionary, they are "[e]xpenses incident to property ownership, such as taxes and upkeep." Black's Law Dictionary 205 (7th ed. 1999). The Department of Agriculture's regulations define carrying charges as incidental costs associated with storing a commodity before delivery under a sales contract, see 7 C.F.R. § 1488.2(f) (1999), and the Securities and Exchange Commission defines them in the leverage contract context as service and interest charges, see 17 C.F.R. § 31.4(l) (1999).

After the FCC promulgated its rule, several cable television companies in Florida filed complaints with the FCC, contending that Florida Power Corporation was charging them unreasonable rents to attach.  See FCC v. Florida Power Corp., 480 U.S. 245, 248-49, 107 S. Ct. 1107, 1110, 94 L. Ed. 2d 282 (1987).  The FCC agreed that the rents were unreasonable and set a lower rent.  Florida Power appealed the FCC's decision to this court, which held that the rent the FCC had set effected a taking of Florida Power's property without just compensation.  Florida Power Corp. v. FCC, 772 F.2d 1537, 1546 (11th Cir. 1985).  The Supreme Court reversed, holding that no taking occurred because Florida Power had voluntarily agreed to the cable companies' attachments.  Had Congress, in the 1978 Act, required utilities to allow the attachments, a taking may have occurred, the court suggested.  See Florida Power Corp. 480 U.S. at 251 n.6, 107 S. Ct. at 1111 n.6.

The Florida Power decision clarified two fundamental precepts underlying the 1978 Act and the FCC's implementing regulations: (1) the FCC had narrow authority under the 1978 Act; it could regulate the power companies only to ensure that, once they consented to an attachment, the conditions of attachment and the rent they were to receive were reasonable; and (2) the FCC's rent formula was not subject to judicial review under the Fifth Amendment's Takings Clause because

12

the 1978 Act's voluntary attachment provision effected no taking for which just compensation would be due.

Not long after the Court decided Florida Power, Congress decided to foster competition in the cable television industry.  To that end, it enacted the Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 (1984) (codified at 47 U.S.C. §§ 521-559 (1994)) (the "Cable Act").  Prior to this enactment, cable television companies operated under exclusive franchises granted by a local government, usually a municipality.  Because these franchises effectively gave the companies monopolies in the franchise territory, the local governments regulated the rates they could charge subscribers.  See H.R. Rep. No. 98-934, at 23-24, reprinted in 1984 U.S.C.C.A.N. 4655, 4660-61.[10]  The approach Congress adopted to encourage competition was to eliminate the power of local governments to set rates for "basic" cable service.  Congress realized that, in the short run at least, this would give incumbent cable operators the ability to charge their subscribers monopoly prices.  Prices would decrease in the long run, however, as local governments granted additional franchises for a given territory. See Johnson Enters., Inc. v. FPL Group, Inc., 162 F.3d 1290, 1296 (11th Cir.

---

[10] The local governments set the rates the cable companies could charge subscribers for "basic" services.  Some states and the FCC set the rates the companies could charge for other services, such as Home Box Office.  See H.R. Rep. No. 98-934, at 24 (1984); reprinted in 1984 U.S.C.C.A.N. at 4661.

1998). New cable companies would be able to enter the market and compete with the incumbent cable company though, only if they could obtain utility pole attachments on the same terms as those given to the incumbent.

In addition to these new demands for pole space, a host of new telecommunications carriers (such as new long distance telephone carriers and wide area telephone service providers), which used wires to carry their signals, began calling on the power and telephone companies to lease them space. They did so because utility poles afforded the only feasible means for stringing their wires. Since the 1978 Act only regulated the rents utilities could charge cable television companies, many utilities demanded monopoly rents from telecommunications carriers. In an effort to alleviate this problem, Congress, in 1996, amended the 1978 Act to give entities providing telecommunications and cable television service the right to "nondiscriminatory access" to utility poles. See 47 U.S.C. § 224(f) (Supp. II 1996).[11] In the event the parties could not agree to

---

[11] Section 224(f) provides:
(1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it.
(2) Notwithstanding paragraph (1), a utility providing electric service may deny a cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a nondiscriminatory basis where there is insufficient capacity and for reasons of safety, reliability, and generally applicable engineering purposes.

14

the terms of the attachment, including the rent, the 1996 Act authorized the FCC to set "just and reasonable" terms.  See id. § 224(b)(1).

The 1996 Act also (1) redefined "utility," changing the definition from "any person whose rates or charges are regulated by the Federal Government or a State" to "any person who is a local exchange carrier, or a electric, gas, water, steam, or other public utility;"[12] (2) redefined "pole attachment" to include attachments by providers of telecommunications service;[13] (3) directed the FCC to create a formula for determining the attachment rent a utility could charge a telecommunications service provider;[14] and (4) instructed utilities on how to apportion the costs of

---

[12] Both definitions of "utility" also require the ownership of poles, used at least in part, for wire communication. Compare 47 U.S.C. § 224(a)(1) (1994), with 47 U.S.C. § 224(a)(1) (Supp. II 1996). Thus, if an entity's poles do not have attachments that are transmitting "writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable or other like connection," 47 U.S.C. § 153(51) (Supp. II 1996), the entity is not a utility for purposes of the Act.

[13] Compare 47 U.S.C. 224(a)(4) (1994), with 47 U.S.C. § 224(a)(4) (Supp. II 1996).  The 1996 version of the Act defined telecommunications, telecommunications carrier, and telecommunications service as follows:  "Telecommunications" is "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received," 47 U.S.C. § 153(43) (Supp. II 1996);  "telecommunications carrier" is any provider of telecommunications services, 47 U.S.C. § 153(44) (Supp. II 1996); "telecommunications service" is the "offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of facilities used," 47 U.S.C. § 153(46) (Supp. II 1996).

[14] See 47 U.S.C. § 224(e)(1) (Supp. II 1996).  For purposes of this opinion, the term "telecommunications service providers" includes cable television companies that provide telecommunications services in addition to cable services.

"unusable" and "usable" space on their poles among telecommunications service providers.[15]

On February 6, 1998, the FCC promulgated regulations implementing its authority under the 1996 Act. See Report and Order, 13 F.C.C.R. 6777. In the Report and Order, the FCC interpreted section 224(f) of the 1996 Act to require that utility companies give Internet providers access to their poles because the Internet was a cable service. See id. at 6795-96. Further, it interpreted the language of section 224(a)(4), which states that pole attachment meant any attachment, and section 224(d)(3), which provides that the FCC's rate applied to any attachment by a telecommunications carrier, to mean that telephone and power companies would have to accept pole attachments for wireless telephone equipment. See id. at 6798-99; see also infra n.22. The agency also determined that the Act precludes utilities from receiving rent for overlashed wires unless those wires significantly increase the burden on the pole. See id. at 6807. Finally,

---

[15] See 47 U.S.C. § 224(e)(2), (3) (Supp. II 1996). Section 224(e)(2) requires utilities to apportion the costs of "unusable space" as follows:

> A utility shall apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities so that such apportionment equals two-thirds of the costs of providing space other than the usable space that would be allocated to such entity under an equal apportionment of such costs among all attaching entities.

Section 224(e)(3) requires utilities to apportion the costs of "usable space" as follows:

> A utility shall apportion the costs of providing usable space among all entities according to the percentage of usable space required for each entity.

the FCC interpreted the Act to prohibit utilities from receiving rent for dark fiber. See id. at 6810.

Having thus interpreted the scope of its authority, the FCC articulated formulas for determining the attachment rents utilities may charge telecommunications service providers. See id. at 6820-30. Until February 2001, the 1978 Act's maximum rent formula for cable providers applies to attachments by telecommunications service providers. After that, the maximum rent will equal the sum of the "unusable" and "usable" rate factors.[16]

In this amended rule, the FCC incorporated almost verbatim the complaint process articulated in its 1978 rule. See 47 C.F.R. §§ 1.1404, 1.1409 (1999). If the parties cannot agree to the rent or other terms of an attachment (or if the utility denies access to its poles), the party contending that the rent or other terms are unjust and unreasonable may petition the Commission to settle the matter. That party bears the burden of establishing a prima facie case that the other party's

---

[16] For poles, the "unusable space" factor = ⅔ x (the percentage of the total pole space that is unusable) x (the attacher's share of the bare costs of maintaining the pole) x (carrying charges). The "usable space" factor = (the percentage of total usable space occupied by the attacher) x (the percentage of total pole space that is usable) x (net costs of the bare pole) x (carrying charges). For conduits, the "unusable space" factor = ⅔ x (net linear costs of unusable space divided by the number of attachers) x (carrying charges). The "usable space" factor for conduits = ½ x (1 duct divided by the average number of ducts less adjustments for maintenance ducts) x (linear cost of usable conduit space) x (carrying charges). 47 C.F.R. §§ 1.1417, 1.1418 (1999); Report and Order, 13 F.C.C.R. at 6820-33.

position is unjust and unreasonable.[17]  If the complainant fails to make out a prima

facie case, the FCC must dismiss its complaint, in which case the rent or conditions

offered or demanded govern the transaction.[18]  If a prima facie case is established,

the Commission determines the maximum just and reasonable rent allowed under

the rule's formula.  Then, it decides the specific just and reasonable rent the

complainant should pay or receive for the attachment.  This determination involves

reviewing items such as costs, rate of return on investment, the utility's filings

before state or federal regulatory agencies, and engineering studies, see 47 C.F.R. §

1.1404(g)(1)-(13) (1999), in addition to considering the maximum rent the FCC's

formula yields.  The FCC's final rate order, like any of its final orders, is then

subject to judicial review under 47 U.S.C. § 402(a) (1994) (providing for judicial

review of FCC orders) and 28 U.S.C. §§ 2342, 2344 (1994) (providing for judicial

review of FCC orders in a United States Court of Appeals).

---

[17] For example, if the party seeking attachment complains that the utility is demanding an unreasonable rent (i.e., more than the maximum allowed under the FCC's formula), it bears the burden of proving that the rent demanded is more than the fully allocated costs of the pole.

[18] It is possible that the Commission's disposition of a complaint – whether a dismissal or an order setting one or more terms – may turn out to be provisional if, after the decision issues, the putative attacher decides to withdraw its request for an attachment.  In this opinion, we assume for sake of discussion that the putative attacher does not withdraw its request and abides by the Commission's decision.

B.

In response to the FCC's Report and Order, power companies across the country filed petitions for review in various courts of appeals. On March 23, 1998, Gulf Power Company, Alabama Power Company, Georgia Power Company, and Southern Company Services filed a joint petition for review in the Eleventh Circuit Court of Appeals. On April 28, 1998, Florida Power & Light Company also filed a petition for review in the Eleventh Circuit. Subsequently, on May 8, 1998, Tampa Electric Company filed a petition for review in the Eleventh Circuit, and Potomac Electric Company filed a petition for review in the D.C. Circuit. The same day, Virginia Electric & Power Company, Duke Energy Company, and Carolina Power & Light Company filed petitions for review in the Fourth Circuit; Duquesne Light Company and Delmarva Power & Light Company filed in the Third Circuit; American Electric Power Service Corporation filed in the Sixth Circuit; Commonwealth Edison Company filed in the Seventh Circuit; and Union Electric Company filed in the Eighth Circuit. Finally, on June 17 and July 16, 1998, respectively, Houston Lighting & Power Company and Public Service Electric & Gas Company filed motions to intervene in the first case filed in the Eleventh Circuit. Their motions were granted on August 4, 1998, the same day we granted the FCC's motion to consolidate all of the petitions for review.

19

In their petitions for review, the Petitioners challenge (1) the implementation of the FCC's formula for computing attachment rents as a taking without just compensation; (2) the implementation of the FCC's overlashing interpretation as a taking without just compensation; (3) the FCC's authority to include wireless communications equipment within the 1996 Act's regulated rate framework; (4) the FCC's authority to include Internet service providers within the 1996 Act's regulated rate framework; and (5) the FCC's decision not to count dark fibers as separate attachments. We discuss each of these challenges below, in parts III-VI.

On the day Gulf Power Company and its co-plaintiffs filed their joint petition for review, Gulf Power and several other utilities[19] brought an action in the United States District Court for the Northern District of Florida seeking declaratory and injunctive relief. See Gulf Power Co. v. United States, 998 F. Supp. 1386 (N.D. Fla. 1998). Contending that the range of rental compensation the 1996 Act provided would in every case operate to deny a utility just compensation, these plaintiffs sought a declaration that the 1996 Act was facially invalid under the Fifth Amendment Takings Clause, and a permanent injunction prohibiting the Commission from enforcing the 1996 Act. See id. at 1389. The plaintiffs also

---

[19] The other utilities were Alabama Power Company, Georgia Power Company, Duke Power Company, Mississippi Power Company, Ohio Edison Company, and Florida Power Corporation.

claimed that allowing the FCC to determine just compensation violated the Separation of Powers doctrine. The district court granted the United States' motion for summary judgment. It concluded that, although the 1996 Act authorized a taking of the plaintiffs' property, it did not deny the plaintiffs just compensation. Rather, it provided a procedure – a proceeding before the Commission – for determining just compensation which did not violate the Separation of Powers doctrine because the Commission's decision was subject to judicial review. See id. at 1397-98.

The plaintiff utilities appealed. A panel of this court upheld the district court's conclusion that the 1996 Act authorized a taking of the plaintiffs' property, but declined to review the court's ruling on just compensation. That issue was not ripe for review because the plaintiffs had not shown that the 1996 Act would operate to deny them just compensation in every case. See Gulf Power Co. v. United States, 187 F.3d 1324, 1338 (11th Cir. 1999) (Gulf Power I). Finally, the panel affirmed the district court's holding that allowing the FCC to determine just compensation in the first instance did not violate the Separation of Powers doctrine. Id. at 1332-37.

II.

21

In their petitions for review, the Petitioners do not present the same challenges the plaintiffs made in Gulf Power I. Instead of attacking the facial validity of the Act under the Fifth Amendment Takings Clause and the Separation of Powers doctrine, the Petitioners question the facial validity of several aspects of the FCC's Report and Order.

We review constitutional challenges to agency regulations de novo. See Rural Tel. Coalition v. FCC, 838 F.2d 1307, 1313 (D.C. Cir. 1988); see also 5 U.S.C. § 706(2)(B) (1994). We use the two-step Chevron analysis to review agency interpretations of a statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984); Legal Envtl. Assistance Found. Inc. v. EPA, 118 F.3d 1467, 1473 (11th Cir. 1997). Under Chevron step one, we determine whether Congress has spoken unambiguously to the question at issue. If it has, our inquiry ends; we give effect to Congress' intent. See Chevron, 467 U.S. at 842-43, 104 S. Ct. at 2781. Under Chevron step two, if we determine that Congress' intent is ambiguous, we defer to a reasonable agency interpretation of Congress' intent. See id. at 843, 104 S. Ct. at 2781-82. In resolving whether an ambiguity exists, we use normal tools of statutory construction, without affording agency interpretations any deference. See INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S. Ct. 1207, 1221, 94 L. Ed. 2d

22

434 (1987); National Mining Ass'n v. Secretary of Labor, 153 F. 3d 1264, 1267 (11th Cir. 1998).

III.

The Petitioners' primary challenge to the FCC's Report and Order is that the rate formula it establishes cannot pass muster under the Fifth Amendment Takings Clause. The Petitioners' challenge presents two separate questions: will the Commission's formula, when implemented, effect a taking of part of utility poles, and if so, will the formula operate to deny the utilities just compensation in every case.

The Gulf Power I panel decided that the 1996 Act authorized a taking of utilities property, but concluded that the issue of whether the statute would operate to deny just compensation in every case was not ripe for review. See Gulf Power I, 187 F.3d at 1338; see also Abbott Lab. v. Gardner, 387 U.S. 136, 148-49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967). The panel's resolution of the takings issue constitutes binding precedent. See Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997). We therefore begin with the premise that the 1996 Act authorizes the Commission, when faced with a complaint filed by an entity providing cable television or telecommunications services, to take a utility's property. Thus, our

23

answer to the first question the Petitioners pose is yes: when the Commission rules on a complaint, a taking may result.

The second question the Petitioners present is whether the Commission's formula will operate to deny utilities just compensation in every case. The Gulf Power I panel held that the just compensation question, when raised in a facial challenge to the 1996 Act, was not ripe unless the plaintiffs could show that just compensation would be denied in all cases. The compensation limits – the maximum and minimum rents – that the Commission's rule prescribes mirror the compensation limits prescribed by the 1996 Act. Compare 47 U.S.C. § 224(b), (d)(1), with 47 C.F.R. § 1.1409. Under the 1996 Act, the lowest rent that may be considered just and reasonable is an amount equal to the incremental cost of adding the new attachment to the utility's pole; the highest rent that may be considered just and reasonable is an amount equal to the fully allocated costs of the pole. See 47 U.S.C. § 224(b), (d)(1). A rent that is higher or lower than these statutory limits would be unjust and unreasonable. Because the outer boundaries of the FCC's formula are identical to those of the 1996 Act, Gulf Power I's ripeness standard binds us. Thus, we inquire whether the Petitioners have shown that the Commission's formula will always deny utilities just compensation.

In this case, we are not called upon to review an FCC determination that a utility provide pole space at a rent that does not amount to the just compensation mandated by the Takings Clause. All that is before us is a facial attack on the Commission's formula and the Petitioners' allegation that factors the Commission took into account in fashioning the formula could never provide just compensation. This is essentially the same argument the utilities made to the Gulf Power I panel. The panel's response was that the utilities failed to establish that " 'no set of circumstances exists under which the Act would be valid.' " Gulf Power I, 187 F.3d at 1336 (quoting United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987)). Although the Petitioners posit circumstances in which the FCC's formula will deny just compensation, we are not confident, given the record at hand, that the formula will deny just compensation in all cases. The Petitioners' facial challenge to the formula is therefore unripe, and we do not address it. Gulf Power I, 187 F.3d at 1338; Cargill, 120 F.3d at 1386.[20]

---

[20] For the same reasons, the issue of whether mandatory overlashing effects a taking without just compensation is also not ripe for review. Utilities, under the FCC's rule, are required to allow overlashing of cables for no additional compensation unless the additional cables "significantly increase the burden on the pole." Report and Order, 13 F.C.C.R. at 6807. This regulatory exception essentially reflects the exception, sometimes called the "engineering and safety exception," present in the Act. See 47 U.S.C. § 224(f)(2). That exception did not prevent the Gulf Power I panel from finding that the 1996 Act authorized a taking, and neither does the regulatory exception prevent us from concluding that the FCC's overlashing rule authorizes a taking. Just compensation was too abstract to determine for the original statutory taking, and thus is also too abstract to determine for the taking authorized by the FCC's overlashing rule. See Gulf Power I, 187 F.3d at 1338; see also Abbott Lab., 387 U.S. at 148-49, 87 S. Ct. at 1515.

25

IV.

The Petitioners challenge the FCC's decision to include wireless carriers within the "nondiscriminatory access" provision of section 224(f), claiming that the FCC has no statutory authority to regulate wireless carriers under the 1996 Act.[21]  We agree.

The FCC contends that Congress' frequent use of the word "any" in the 1996 Act indicates an intent to have the Commission broadly regulate pole attachments.[22]  As long as an attachment is made by a cable television company or a telecommunications service provider, the FCC contends, the attachment may be regulated under section 224(d) or (e), no matter what kind of attachment it is.  This position is contrary to the Commission's narrow authority to regulate power

---

[21] As stated in part II supra, questions of pure statutory construction fall within a Chevron step one analysis.  We, therefore, owe no deference to an agency's construction of a statute.    See Cardoza-Fonseca, 480 U.S. at 446; 107 S. Ct. at 1221; National Mining Ass'n, 153 F.3d at 1267.

[22] Specifically, the FCC cites Congress' use of the word "any" in the following two provisions:
> The term "pole attachment" means any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility.

47 U.S.C. § 224(a)(4) (emphasis added).
> This subsection shall apply to the rate for any pole attachment used by a cable television system solely to provide cable service.  Until the effective date of the regulations required under subsection (e) of this section, this subsection shall also apply to the rate for any pole attachment used by a cable system or any telecommunications carrier (to the extent such carrier is not a party to a pole attachment agreement) to provide any telecommunications service.

47 U.S.C. § 224(d)(3) (emphasis added).

26

companies. The FCC's organic statute does not give it authority to regulate power utilities. See 47 U.S.C. § 151 (1994) (creating the FCC to regulate interstate and foreign commerce in radio and wire communication). Congress placed power companies within the agency's regulatory authority for pole attachment purposes only. See 47 U.S.C. § 224(a)(1).

Section 224(a)(4) defines a pole attachment as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." A utility, according to section 224(a)(1) is "any person . . . who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications."[23] Read in combination, these two provisions give the FCC authority to regulate attachments to poles used, at least in part, for wire communications, and by negative implication does not give the FCC authority over attachments to poles for wireless communications.[24]

_____

[23] The term "wire communications" is defined as "the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(51) (emphasis added).

[24] The fact that power companies that do not use their poles to transmit wire communications are not covered by the Act and the FCC's implementing regulations, see supra nn.12, 23, further supports this narrow reading of the FCC's authority. The dissent takes issue with this reading of section 224, stating that we make more of the wire-based definition of utility than Congress intended. The dissent's reasoning is contrary to its own suggestion that we follow the

27

That wires are integral to the FCC's authority is supported by the legislative history of the 1978 Act.[25]  Congress' reason for passing it was that the Commission did not believe it had authority to regulate power companies since pole attachment arrangements "d[id] not constitute communication by wire or radio."  S. Rep. No.95-580, at 14,  reprinted in 1978 U.S.C.C.A.N. at 122 (internal quotation marks omitted).   The FCC reasoned that:

> The fact that cable operators ha[d] found in-place facilities convenient or even necessary for their businesses [wa]s not sufficient basis for finding that the leasing of those facilities [wa]s wire or radio communications.  If such were the case, we might be called upon to regulate access and charges for use of public and private roads and right of ways essential for the laying of wire, or even access and rents for antenna sites.

---

straightforward statutory language of section 224.  The language of section 224 plainly says that attachments may be made to poles used for wire communications; it says nothing about attachments for wireless communications.

[25] The statutory language of section 224 itself prohibits the FCC from regulating pole attachments for wireless communications; thus, we may end our review with that language.  An understanding of the communications industry and Congress' attempts at regulating it helps one understand why Congress wrote section 224 to prohibit the FCC from regulating wireless communications.  To provide this understanding, we use normal tools of statutory construction and eliminate any hint of ambiguity in the statutory language.  See Cardoza-Fonseca, 480 U.S. at 432 n.12, 107 S. Ct. at 1213 n.12 ("As we have explained, the plain language of this statute appears to settle the question before us.  Therefore, we look to the legislative history to determine only whether there is 'clearly expressed legislative intention' contrary to that language, which would require us to question the strong presumption that Congress expresses its intent through the language it chooses.") (quoting United States v. James, 478 U.S. 597, 606, 106 S. Ct. 3116, 3121, 92 L. Ed. 2d 483 (1986)); see also infra n.39 (Carnes, J., dissenting).

28

Id. Before 1978, the FCC's regulatory authority did not extend to power companies because power companies did not use their poles primarily for communication by wire or radio. This hindered the growth of the cable television market. The FCC could regulate what telephone companies charged to attach, but could not regulate what the power companies charged to attach. Because telephone and power poles generally did not run side-by-side, the cable companies at times were forced to attach to power company poles instead of telephone poles, and to pay monopoly rents. To prevent the power companies from taking unfair advantage of their bottleneck facilities in this manner, Congress brought them under the FCC's regulatory umbrella, permitting "[f]ederal involvement in pole attachments matters . . . where space on a utility pole ha[d] been designated and [wa]s actually being used for communications services by wire or cable." Id. at 15, reprinted in 1978 U.S.C.C.A.N. at 123 (emphasis added). The reason Congress gave this pole attachment authority to the FCC was that the Commission already regulated all other aspects of the cable industry and cable companies were the only entities seeking to attach to poles in 1978.

In 1996, when Congress amended the 1978 Act, it once again expanded the FCC's jurisdiction; this time to include attachments by telecommunications service providers. Nothing in the legislative history indicates that the original purpose

behind regulating utility poles – to prevent the telephone and power companies from charging monopoly rents to connect to their bottleneck[26] facilities – changed. Rather, the legislative history suggests the same thing the language alteration suggests:  Congress wanted to allow telecommunications service providers, like the cable television companies before them, to attach to the utilities' bottleneck facilities without having to pay monopoly rents.  See H. Rep. No. 104-204, at 92 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 58.

The Petitioners' poles are not bottleneck facilities for wireless carriers. Wireless attachments to poles "include an antenna or antenna clusters, a communications cabinet at the base of the pole, coaxial cables connecting antennas to the cabinet, concrete pads to support the cabinet, ground wires and trenching, and wires for telephone and electric service."  Report and Order, 13 F.C.C.R.. at 6799.  Most of this equipment can be placed on any tall building, and the whole set-up requires more physical space then a wireline system.  Further, wireless systems operate in a completely different way than do wireline systems.  Wireline networks transmit through linear networks of cables strung between poles. Wireless networks, on the other hand, transmit through a series of concentric circle

---

[26] See AT&T Corp. v. Iowa Util. Bd., 525 U.S. 366, 388, 119 S. Ct. 721, 734, 142 L. Ed. 2d 835 (1999) (defining bottleneck facilities as something akin to the essential facilities of antitrust law).

emissions that allow the network to continue working if one antenna malfunctions. Indeed, it is highly questionable whether there are any bottleneck facilities for wireless systems. What is beyond question is that utility poles are not bottleneck facilities for wireless systems. Because they are not, and because the 1996 Act deals with wire and cable attachments to bottleneck facilities, the act does not provide the FCC with authority to regulate wireless carriers.[27]

Although Congress did not give the FCC authority to regulate the placement of wireless carriers' equipment under section 224 (or any other section) of the Telecommunications Act of 1996, that statute did address, in part, such regulation by state and local governments. Section 332[28] states that "[t]he regulation of the placement, construction, and modification of personal wireless services facilities by any State or local government or instrumentality thereof – shall not unreasonably discriminate among providers of functionally equivalent services; and shall not prohibit or have the effect of prohibiting the provision of personal wireless service." Pub. L. No. 104-104, § 704(B)(i)(I),(II), 110 Stat. 149 (1996)

---

[27] The FCC seemed to recognize that this might be the case when it stated that, "[t]here are potential difficulties in applying the Commission's rules to wireless pole attachments." Report and Order, 13 F.C.C.R. at 6799.

[28] The wireless communications section of the Telecommunications Act of 1996 follows the pole attachment section; as codified, however, the two sections do not follow one another. Compare Pub. L. No. 104-104, §§ 703, 704, 110 Stat. 149 (1996), with 47 U.S.C. §§ 224, 332 (Supp. II 1996).

(codified at 47 U.S.C. § 332(7)(B)(i)(I), (II)).  The section goes on to require a state to act on requests to site wireless equipment within a reasonable time, to require a state to put its reasons for denying any such request in writing, and to limit the reasons a state can assert for determining where wireless carriers can locate their equipment.  See id. § 704(B)(ii)-(iv) (codified at 47 U.S.C. § 332(7)(B)(ii)-(iv)).  The specificity with which Congress addressed the siting of wireless equipment in section 332 indicates that it did not intend that section 224 provide the FCC authority to regulate the placement of wireless carriers' equipment.

V.

Next, Petitioners challenge the FCC's statutory authority to regulate attachments for Internet service under the 1996 Act.  As with wireless carriers, we agree that the FCC has no authority under that act to regulate Internet service providers.  The 1996 Act allows the Commission to regulate the rates for cable service and telecommunications service; Internet service is neither.

The FCC argues that Internet service provided by a cable television system is either "solely cable services" or is subject to regulation under section 224(b)(1)'s mandate to "ensure that the rates, terms, and conditions [for pole attachments] are

32

just and reasonable." Report and Order, 13 F.C.C.R. at 6795-96 (internal quotation

marks omitted). To accept this argument requires us to disregard the unambiguous

language of the 1996 Act, which we cannot do. See Robinson v. Shell Oil Co., 519

U.S. 337, 340-41, 117 S. Ct. 843, 846, 136 L. Ed. 2d 808 (1997). The 1996 Act

calls for the Commission to establish two rates for pole attachments.[29] One,

described in section 224(d), applies to "any pole attachment used by a cable

television system solely to provide cable service." 47 U.S.C. § 224(d)(3). The

second rate applies to "charges for pole attachments used by telecommunications

carriers to provide telecommunications services." 47 U.S.C. § 224(e)(1). For the

FCC to be able to regulate the rent for an attachment that provides Internet service

then, Internet service must qualify as either a cable service or a

telecommunications service.

Cable service, defined in section 522, is "the one-way transmission to

subscribers of (i) video programming, or (ii) other programming service, and

subscriber interaction, if any, which is required for the selection or use of such

---

[29] The dissent contends that our reading of section 224 ignores subsection (b)(1)'s mandate that the FCC provide just and reasonable rates for pole attachments. To the contrary, our reading gives effect to all parts of section 224 while the dissent's reading ignores the fact that subsections (d) and (e) narrow (b)(1)'s general mandate to set just and reasonable rates. The straightforward language of subsections (d) and (e) directs the FCC to establish two specific just and reasonable rates, one for cable television systems providing solely cable service and one for telecommunications carriers providing telecommunications service; no other rates are authorized.

video programming or other programming service." 47 U.S.C. § 522(6)(A), (B) (1994 & Supp. II 1996).[30] The only difference between this definition of "cable service" and the definition included in the 1978 Act is the addition of the words "or use." According to the House Report accompanying the 1996 amendments, the inclusion of the words "or use" was meant to "reflect[] the evolution of video programming toward interactive services." H. Rep. No. 104-204, at 97, reprinted in 1996 U.S.C.C.A.N. at 64. This is the only sentence in the legislative history that attempts to explain Congress' change to the definition of "cable service." Although what it means to reflect an evolution of video programming toward interactive service is not exactly clear, it is clear from Congress' lack of discussion of this change that it was minor in both language and intent. If Congress by the addition of these two words meant to expand the scope of the "cable service" definition from its traditional video base to include all interactive services, video and non-video, it would have said so. Without any substantive comment, we will not read this minor change to effectuate a major statutory shift. See Walters v. National Ass'n of Radiation Survivors, 473 U.S. 305, 318, 105 S. Ct. 3180, 3187, 87 L. Ed.

---

[30] Although section 522 states that its definitions apply only to that subchapter, we give words a consistent meaning throughout the statute unless otherwise instructed by Congress. See Richards v. United States, 369 U.S. 1, 11, 82 S. Ct. 585, 591-92, 7 L. Ed. 2d 492 (1962) ("We believe it fundamental that a section of a statute should not be read in isolation from the context of the whole Act.") (footnotes and internal quotations omitted); Nipper v. Smith, 39 F.3d 1494, 1515 (11th Cir. 1994).

2d 220 (1985) (stating that without substantive comment "it is generally held that a change during codification is not intended to alter the statute's scope") (citing Muniz v. Hoffman, 422 U.S. 454, 467-74, 95 S. Ct. 2178, 2185-89, 45 L. Ed. 2d 319 (1975)).  How then did the addition of the words "or use" alter the definition of "cable service"?  The statute's plain language and Congress' one sentence explanation suggest that Congress expanded the definition to include services that cable television companies offer to their customers to allow them to interact with traditional video programming.[31]

Although the statute includes interaction with other programming – in addition to video programming – within the definition of "cable service," we cannot read the language "other programming" broadly to include Internet services.  "Other programming" has been part of the definition of "cable service" since 1978, when the Internet was only a tool for researchers and the military, not a commodity that would require regulation.  When Congress used this language then, it could not have intended it to cover Internet services provided by cable companies.  Again, we will not radically expand the scope of the definition of "cable service" from a video base to an all-interactive-services base without some

---

[31] Video programming means "programming provided by, or generally considered comparable to programming provided by, a television broadcast station."  47 U.S.C. § 522(20).

substantive indication from Congress that this is indeed its intent.  See Walters,

473 U.S. at 318, 105 S. Ct. at 3187.[32]

Furthermore, as an aside, we note that the FCC, itself, has defined the

Internet as an information service, not as a cable service.  See In re Fed.-State Joint

Bd. on Universal Serv., 13 F.C.C.R. 11501 ¶ 66 ("Internet service providers

themselves provide information services . . . . ").  Thus, the FCC lacks statutory

authority to regulate the Internet under the 1996 Act based on the theory that

Internet service is a cable service.

The only remaining basis for the Commission's authority to regulate the

Internet under the 1996 Act is to treat the Internet as a telecommunications service.

---

[32] The Commission urges us to adopt the D.C. Circuit's reasoning in Texas Utilities Electric Co. v. FCC, 997 F.2d 925 (D.C. Cir. 1993), in determining whether pole attachments used by a cable television company to provide Internet service are entitled to a regulated rent under the 1996 Act. We decline to do so.  The D.C. Circuit decided Texas Utilities Electric Co. before the 1996 amendments were enacted.  Prior to 1996, section 224 instructed the FCC to set a reasonable rent for "any attachment by a cable television system."  47 U.S.C. § 224(a)(4), (d)(1) (1994).  It did not specify the particular services of a cable television system that were entitled to a regulated rent. Because Congress, in passing the 1978 Act, did not specify whether it "place[d] greater emphasis on the type of service to be distributed over the attachment or the type of entity doing the attaching," Texas Utils. Elec. Co., 997 F.2d at 930, the court found the statute ambiguous.  The court, therefore, deferred to the FCC's interpretation that co-mingled services were covered by section 224.  Today we are faced with an entirely different situation from that faced by the D.C. Circuit in Texas Utilities Electric Co. because Congress, in 1996, amended the Act to eliminate the ambiguity at issue in that case.  The new section 224(d)(3) states that "solely cable services" receive regulated rents. (Telecommunications services, which also receive regulated rents are discussed in the text infra.) Because we now know that the statute emphasizes the type of service over the type of entity acquiring the attachment, we have no need to follow the reasoning of Texas Utilities Electric Co. Indeed, to follow that reasoning would be to disregard our duty under Chevron to give effect to Congress' unambiguous intent.  Chevron, 467 U.S. at 842-43, 104 S. Ct. at 2781.

<u>See</u> 47 U.S.C. § 224(d)(3), (e) (directing the Commission to develop a rate for telecommunications carriers providing telecommunications service). The FCC, however, did not raise that argument before us. Nor could it have because the FCC has specifically said that the Internet is not a telecommunications service. <u>See Report and Order</u>, 13 F.C.C.R. at 6795 ("The <u>Universal Service Order</u> concluded that Internet service is not the provision of a telecommunications service under the 1996 Act."); <u>In re Fed.-State Joint Bd. on Universal Serv.</u>, 12 F.C.C.R. 87 ¶ 69 (1996) ("Internet service does not meet the statutory definition of a 'telecommunications service.' ").[33] Accordingly, there is no statutory basis for the FCC to regulate the Internet as a telecommunications service under the 1996 Act.

In sum, Congress, in the 1996 Act, authorized the FCC to develop rent formulas for attachments providing cable and telecommunications services. Internet service does not meet the definition of either a cable service or a telecommunications service. Therefore, the 1996 Act does not authorize the FCC to regulate pole attachments for Internet service.

---

[33] The FCC has given the following examples of telecommunications services: cellular telephone and paging services, mobile radio services; operator services, PCS (personal communications services); access to interexchange service; special access; wide area telephone service (WATS); toll-free service; 900 service; MTS; private line; telex; telegraph; video services; satellite services; and resale services. <u>In re Fed.-State Joint Bd. on Universal Serv.</u>, 12 F.C.C.R. 8776 ¶ 780 (1997). Even if this list is not exhaustive, all of these examples are materially different from the Internet.

VI.

The Petitioners' final challenge is to the FCC's statutory authority to regulate the rents utilities charge for dark fiber attachments. Dark fiber, which exists within a fiber optic cable, "consists of . . . bare capacity and does not involve any of the electronics necessary to transmit or receive signals over that capacity." Report and Order, 13 F.C.C.R. at 6810. The advantage of stringing cables with lit and dark fiber is that dark fiber provides excess distribution and transmittal capacity for a cable or telecommunications company to use as its service network expands. Dark fiber also may be leased to a third party. Because dark fiber is bare capacity, it technically is neither a telecommunications service nor a cable service. In fact, it is not a service at all; it is simply an inactive fiber.

The 1996 Act authorizes the FCC to regulate the pole attachments of cable television and telecommunications companies that provide cable and telecommunications services. See 47 U.S.C. § 224; supra part V. The 1996 Act says nothing about regulating bare capacity. But, these bare capacity fibers do not generally exist on their own. They are usually located within cables that also contain fibers providing cable or telecommunications services, i.e., lit fibers the FCC clearly has the authority to regulate. Thus, unlike Internet service or wireless carriers, the statute's silence does not resolve the issue of whether the Commission

38

may regulate dark fiber. Both Internet service and wireless carriers are similar to items the statute covers. The statute defines the kinds of attachers it covers, and wireless carriers do not fall within that definition. Similarly, the statute defines the types of wire services it covers, and Internet services are not one of those services. We can, therefore, say, based on the 1996 Act alone, that the FCC lacks the authority to regulate wireless carriers and the provision of Internet services. Dark fiber, however, is not a service (nor, of course, is it a type of attacher). Thus, the fact that it falls outside the definitions of "cable service" and "telecommunications service" tells us nothing about Congress' intent to regulate dark fiber. Congress did say that it did not intend to have an attacher pay twice for a single attachment, see H.R. Rep. No. 104-204, at 92, reprinted in 1996 U.S.C.C.A.N. at 59, but the legislative history does not indicate whether dark fiber and its host were to be considered a single attachment. Congress' intent is ambiguous; therefore, we proceed to step two of the Chevron analytical framework and consider whether the FCC reasonably interpreted Congress' silence on dark fiber. See Chevron, 467 U.S. at 843, 104 S. Ct. at 2781-82.[34]

_____

[34] Our conclusion that Congress' intent is ambiguous is consistent with our conclusion that section 224 does not authorize the FCC to regulate wireless carriers or the provision of Internet services because, as we state in the text, wireless carriers and Internet service are similar in kind to the attachers and services the 1996 Act discusses. Dark fiber, however, is a different bird altogether. Neither the statute nor the legislative history discusses anything similar to dark fiber. Therefore, we cannot even begin to discern, let alone declare unambiguous, Congress' intent regarding dark fiber.

The FCC decided that dark fiber is not a separate attaching entity from its host attachment.  See Report and Order, 13 F.C.C.R. at 6811.[35]  According to the FCC, dark fibers place no more burden on a pole than do their host attachments.  See id.  This makes sense since dark fiber, by definition, is merely bare capacity and is included within its host attachment at the time that cable is attached to the pole.  Further, we presume that in determining the rent for the host attachment, the utility and the FCC will account for the dark fibers contained within the attaching host.  By accounting for the dark fibers in the rent determination for the host cable, the Commission ensures that the utility receives just compensation for any burden the dark fiber may cause the pole at the time the host attaches.  Hence, once the utility has been compensated, there is no reason to treat dark fiber as a separate attaching entity, and the FCC's decision not to do so is reasonable.[36]

VII.

---

[35] Section 224(e)(2) directs a utility to "apportion the cost of providing space on a pole, duct, conduit, or right-of-way other than the usable space among entities," and section 224(e)(3) directs a utility to "apportion the cost of providing usable space among all entities."  The FCC determined that dark fiber did not constitute a separate entity from its host attacher for purposes of sections 224(e)(2) and (3).

[36] Our ruling on dark fiber is narrow; holding only that it was reasonable for the FCC to consider pure dark fiber and its host as one attaching entity.  We are not presented with a factual scenario involving dark fiber that becomes lit, thus we do not address the status of such a fiber.  Nor do we address dark fiber located within a cable whose attachment the FCC lacks authority to regulate under section 224(f).

For the foregoing reasons, we hold that the nondiscriminatory access provision of the 1996 Act authorizes a taking of a portion of the Petitioners' poles, which occurs when the FCC issues a rent determination order as to a particular pole or set of poles. Whether the rent formula developed by the FCC, including its decision not to require additional compensation for overlashed wires, provides just compensation is not ripe for review because it is not presented in a sufficiently concrete form for adjudication. Further, we hold that the FCC lacks the authority to regulate wireless carriers and the provision of Internet service under the 1996 Act. Finally, we hold that the FCC's decision not to count leased dark fiber as an additional attaching entity is reasonable.

SO ORDERED.

CARNES, Circuit Judge, concurring in part and dissenting in part:

On review in these cases is <u>In the Matter of Implementation of Section 703(e) of the Telecommunications Act of 1996</u>, 13 F.C.C.R. 6777 (1998) ("<u>Order</u>"), the order of the Federal Communications Commission which implements the amendments to the Pole Attachment Act of 1978, 47 U.S.C. § 224, contained in the Telecommunications Act of 1996. Because I believe that the Pole Attachment Act of 1978, as amended, extends regulated rates to all pole attachments, including those used for wireless telecommunications service and Internet service, I dissent from the parts of the Court's decision reaching a contrary conclusion.

I do agree with the majority opinion's conclusions regarding the petitioners' facial attack on the rate formula prescribed in the <u>Order</u>. As this Court held in <u>Gulf Power Co. et al. v. United States</u>, 187 F.3d 1324 (11th Cir. 1999) ("<u>Gulf Power I</u>"), section 224(f), the statutory provision requiring utilities to accept pole attachments, effects a per se taking of property under the Fifth Amendment for which just compensation is required.[1] <u>Id.</u> at 1328-31. But the petitioners have failed to show

---

[1] Section 224(f) reads as follows:

> (1) A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, conduit, or right-of-way owned or controlled by it.
> (2) Notwithstanding paragraph (1), a utility providing electric service may deny a

that the Order's rate formula will deny just compensation in every case. Consequently, their facial challenge to the formula is unripe and, as the majority opinion concludes, it should not be considered by this Court.[2] Id.

I disagree, however, with the majority opinion's holdings regarding wireless telecommunications service and Internet service. It concludes that the FCC has no authority to regulate either wireless telecommunications carriers or Internet service providers, but the plain language of the statute mandates the opposite conclusion.[3]

Section 224(b)(1) provides that the FCC "shall regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are

---

cable television system or any telecommunications carrier access to its poles, ducts, conduits, or rights-of-way, on a non-discriminatory basis where there is insufficient capacity and for reasons of safety, reliability and generally applicable engineering purposes.

[2] Likewise, I agree with the majority opinion's conclusion regarding the petitioners' argument that the rate formula denies just compensation when wires are overlashed because no additional compensation is awarded. It is possible that in some cases the rate formula will provide just compensation for both the original attachment and the overlashed cables without additional compensation. Again, the petitioners have failed to show that the rate formula will deny just compensation in every case. Thus, their challenge is unripe.

[3] As noted in the majority opinion, we apply the two-step Chevron analysis to agency interpretations of a statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S. Ct. 2778 (1984). "First, the court is to determine if the intent of Congress is clear; if so, that is the end of the matter. On the other hand, if Congress has not spoken directly to the precise question at issue, a second step of review comes into play, and the court must determine whether the agency's answer to the question Congress left open reflects a permissible construction of the statute." Jaramillo v. INS, 1 F.3d 1149, 1152 (11th Cir. 1993) (en banc). We use the normal tools of statutory construction to judge whether Congress' intent is clear. See INS v. Cardoza Fonseca, 480 U.S. 421, 446, 107 S. Ct. 1207, 1221 (1987) (quoting Chevron, 467 U.S. at 843 n. 9, 104 S. Ct. at 2782 n. 9).

just and reasonable." The term "pole attachment" is defined in section 224(a)(4) as "any attachment by a cable television system or provider of telecommunications service to a pole, duct, conduit, or right-of-way owned or controlled by a utility." (emphasis added). As this Court has stated, more than once, "the adjective 'any' is not ambiguous; it has a well-established meaning." Merritt v. Dillard Paper Co., 120 F.3d 1181, 1186 (11th Cir. 1997); accord Lyes v. City of Rivera Beach, Florida, 166 F.3d 1332, 1337 (11th Cir. 1999) (en banc). "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035, 137 L. Ed. 2d 132 (1997) (citations omitted) (as quoted in Merritt, 120 F.3d at 1186). Applying that definition to sections 224(a)(4) and (b)(1), the FCC has the authority to regulate all attachments, i.e., attachments "of whatever kind," id., by a cable television system or provider of telecommunications service to a pole, duct, conduct, or right-of-way owned or controlled by a utility. Obviously, all attachments includes those attachments used to provide wireless and Internet services.

The majority opinion does not attempt to justify its conclusions regarding wireless service with the language of the statute, except to say that there is a "negative implication" created by the statutory definition of a pole attachment

coupled with the definition of a utility.[4]  But the negative implication, if there is

one at all, is not nearly as strong as the majority seems to think.  The statutory

definition of utility serves merely to exempt from mandatory access any utility that

does not make its poles available for wire communications at all.  If a utility does

not make its poles available for wire communications, it does not have to make its

poles available for wireless communications.  However, once a utility makes its

poles available, even "in part," for wire communications, it is subject to

mandatory access for all pole attachments.  Nothing about the definition of utility

negates the FCC's mandate to regulate rates for all pole attachments.

Notwithstanding the straightforward statutory language, the majority opinion

turns to legislative history to justify its conclusion about wireless communications.

But the Supreme Court, as well as this Court, has repeatedly held when the

meaning of a statute is clear from its plain language, it is unnecessary to look to

legislative history.  See Gonzales, 117 S.Ct. at 1035 ("Given the straightforward

statutory command, there is no reason to resort to legislative history."); Ratzlaf v.

United States, 510 U.S. 135, 147-48, 114 S.Ct. 655, 662 (1994) ("we do not resort

to legislative history to cloud a statutory text that is clear."); United States v.

---

[4] Pole attachment is defined in section 224(a)(4) as "any attachment ... to a pole, duct, conduit, or right-of-way owned or controlled by a utility."  Utility is defined in section 224(a)(1) as "any person ... who owns or controls poles, ducts, conduits, or rights-of-way used, in whole or in part, for any wire communications."

45

Paradies, 98 F.3d 1266, 1288 (11th Cir. 1996) ("Because the language in the statute is clear, it would be improper to look to the legislative history for clarification."). Because the statutory language at issue is unambiguous, resort to legislative history in order to undermine it is unnecessary and improper.

With respect to Internet service, the majority opinion concludes that the FCC has no authority to regulate it because Internet service is neither a cable service nor a telecommunications service, and is thus not covered by the rate formulas described in section 224(d) for "solely" cable services and in section 224(e) for telecommunications services. But the majority opinion fails to address the section 224(b)(1) mandate that the FCC "regulate the rates, terms, and conditions for pole attachments to provide that such rates, terms, and conditions are just and reasonable ...." Because pole attachment is defined as "any attachment," and because of the unambiguous definition of "any," section 224(b)(1) requires the FCC to ensure just and reasonable rates for all pole attachments, including those used to provide Internet service.

Finally, I agree with the majority opinion's conclusion that the FCC has the authority to regulate dark fiber and that the FCC's decision not to treat dark fiber as a separate attaching entity is reasonable. For reasons I have already discussed, dark fiber is within the definition of pole attachment, and it is therefore within the

FCC's regulatory authority.  The FCC's decision to treat dark fiber and its host attachment as one attaching entity is reasonable, because, as the majority opinion notes, "dark fiber, by definition, is merely bare capacity and is included within its host attachment at the time that cable is attached to the pole."

The problem is how the majority opinion reaches the conclusion that the FCC is authorized to regulate dark fiber. It does so by concluding that because dark fiber is neither a cable service nor a telecommunications service, the statute is ambiguous.  But the same majority opinion also concludes that because Internet service is neither a cable service nor a telecommunications service, the statute is unambiguous and Internet service is outside the FCC's regulatory authority.  The majority cannot have it both ways – either the statute unambiguously gives the FCC the authority to regulate only cable and telecommunications services, or the statute is ambiguous about whether the FCC has authority to regulate more than cable and telecommunications services.  My view is consistent: The statute unambiguously gives the FCC authority to regulate any and all pole attachments. The majority opinion's view is not consistent.

Because I believe that the statute unambiguously gives the FCC regulatory authority over wireless telecommunications service and Internet service, I dissent from those parts of the majority opinion holding to the contrary.

47